**Jack E. GOLSEN and Sylvia H. Golsen, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 310-70.**

United States Court of Appeals, Tenth Circuit.

June 18, 1971.

---

7. Treasury Regulations on Estate Tax, § 20.2053-4 (26 C.F.R. 1971).

Julian P. Kornfeld, of Andrews, Mosburg, Davis Elam, Legg & Kornfeld, Oklahoma City, Okl., for appellants.

Johnnie M. Walters, Asst. Atty. Gen. (Joseph M. Howard, Bennet N. Hollander and William S. Estabrook, Attys., Tax Div., Dept. of Justice, on the brief), for appellee.

Before LEWIS, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is an action in which the plaintiffs-appellants sought an income tax refund in the amount of $2,918.15 growing out of an assessed deficiency for the taxable year 1962. The item in dispute is tax assessed on what purports to be an interest payment to Western Security Life Insurance Company. The taxpayers deducted this interest in the amount of $12,441.40. The Commissioner disallowed the interest deduction whereupon this action was commenced. The Tax Court upheld the Commissioner, thus determining that the interest deduction was not proper under 26 U.S.C. § 163(a).[1]

The case before us revolves around the issuance on January 31, 1962, by Western Security Life Insurance Company to the Golsens life insurance in the face amount of $1,000,000 consisting of twenty "executive special" policies, each having a face amount of $50,000 and an effective date of December 28, 1961. They named Jack E. Golsen as insured, and Mrs. Golsen as beneficiary; their three children are contingent beneficiaries. The "executive special" policies appeared on their faces to be whole life policies, providing for aggregate premiums of $68,180 a year for the first twenty years and $18,180 a year thereafter.

The "executive special" policies implemented an insurance program embodying the following principal elements:

1. The insured first "borrowed" from Western the entire amount of the first year cash value, which he used simultaneously to pay the greater part of the first year's premium.

2. He, at the same time, "borrowed" a much larger sum from Western. With most of the proceeds of the "loan" he simultaneously established a so-called "prepaid premium fund" in the amount of the present value of the aggregate annual premiums for the following four years, discounted at an annual rate of three percent. Western undertook to pay interest on the "prepaid premium fund" at the rate of three percent a year, and that fund, when supplemented by the interest increments paid by Western, were sufficient at each of the next four anniversary dates of policies to pay the annual aggregate premium of $68,180.

3. At the beginning of the first year, the insured simultaneously paid in advance that year's four percent "interest" on the sums he had "borrowed."

4. As the "prepaid premium fund" was reduced each year thereafter by the purported payment of premiums therefrom for such year, the insured was in turn to "replenish" the fund by a "prepayment" in respect of the premiums to become due four years thereafter. The amount thus added to the fund each year was $60,577.90, which, at three percent

---

[1]. The essence of the decision of the Tax Court was, first, that the complex of loans from Western to the insured in connection with the insurance policies issued on his life were sham and as such were designed first to pay for bare insurance coverage and, secondly, to give to the appellants an interest deduction which would serve to pay for this coverage. The court found that the loans were not binding obligations; that they were subject to cancellation which merely required offsetting debits and credits on Western's books. The Tax Court determined that it was bound to follow this court's decision in Goldman v. United States, 403 F.2d 776 (10th Cir. 1968), and that *Goldman* was exactly in point.

compound interest, was expected to increase to $68,180 four years thereafter and accordingly be sufficient to pay the premiums falling due at that time.

5. Each year after the issuance of the policies, the insured would "borrow" the full amount of the increase in the loan value of the policies for that year, and he would simultaneously use part of the proceeds of such "loan" to pay the full amount of $60,577.90 to be added to the "prepaid premium fund" and would use the balance to pay part of the annual "interest" charges on his growing indebtedness to Western.

6. After the first year, no part of the insured's out-of-pocket costs would be allocable to premiums, and, as a consequence of treating the "interest" as deductible, the insured's actual cost of the insurance purchased by him would either be comparatively nominal or result in a net profit to him. The insured was never to be personally liable on any of his "loans", and the policies would never in *fact* have *any* cash surrender value as a result of the "loans."

The table which is set forth below shows the approximate figures as to some of the more important elements of Golsens' life insurance program.[2]

As each year's $68,180.00 premium is paid out of the prepaid premium fund, the cash (or loan) value of the policy increases and the value of the death benefit increases. In fact, examination of column (1) indicates that the cash value increases by an increasing amount which after the third policy year exceeds the amount of the $68,180.00 annual premium. Whether these substantial amounts of cash value increases are due to an amount of "implicit interest" paid to the policyholder on the cash value on deposit with the insurance company was not determined by the Tax Court. The Tax Court did determine that "[t]he so-called annual premium on the "executive special" policies was set at an artificially high level so as to create an abnormally high cash value in order to facilitate or make possible the purported lending transaction * * *." Golsen v. Comm'r, 54 T.C. 742, at 17 (filed April

2.

| (1) Increase in Cash Value from Preceding Year * | (2) "Borrowing" Used to Pay Discounted Premium | (3) Remaining Cash Value Available for Pmt of Interest | (4) "Interest" Payments | (5) Out-of-Pocket Expenses |
|---|---|---|---|---|
| $50,000.00 | $50,000.00 | $–0– | $12,441.40 | $23,019.40 |
| 66,940.00 | 60,577.90 | 6,362.10 | 15,119.00 | 8,756.90 |
| 68,500.00 | 60,577.90 | 7,922.10 | 17,859.00 | 9,936.90 |
| 70,060.00 | 60,577.90 | 9,922.10 | 20,661.40 | 11,179.30 |
| 71,630.00 | 60,577.90 | 11,052.10 | 23,526.60 | 12,474.50 |
| 73,220.00 | 60,577.90 | 12,642.10 | 26,455.40 | 13,813.30 |
| 74,790.00 | 60,577.90 | 14,212.10 | 29,447.00 | 15,234.90 |
| 76,360.00 | 60,577.90 | 15,782.10 | 32,501.40 | 16,719.30 |
| 77,920.00 | 60,577.90 | 17,342.10 | 35,618.20 | 18,276.10 |
| 79,460.00 | 60,577.90 | 18,882.10 | 38,796.60 | 19,914.50 |
| 80,980.00 | 60,577.90 | 20,402.10 | 42,035.80 | 21,633.70 |
| 82,470.00 | 60,577.90 | 21,892.10 | 45,334.60 | 23,442.50 |
| 83,920.00 | 60,577.90 | 23,342.10 | 48,691.40 | 25,349.30 |
| 85,340.00 | 60,577.90 | 24,762.10 | 52,105.00 | 27,342.90 |
| 86,680.00 | 60,577.90 | 26,102.10 | 55,572.20 | 29,470.10 |
| 87,980.00 | 60,577.90 | 27,402.10 | 59,091.40 | 31,689.30 |
| 89,180.00 | 62,391.50 | 26,788.50 | 60,162.90 | 33,374.40 |
| 90,300.00 | 64,266.40 | 26,033.60 | 61,204.20 | 35,170.60 |
| 91,330.00 | 67,196.00 | 24,134.00 | 62,209.60 | 38,075.60 |
| 92,220.00 | 68,180.00 | 24,040.00 | 63,171.20 | 39,131.20 |

* These amounts, which are added to the total cash value balance each year, are available for borrowing each year by the insured.

9, 1970). In any event, Golsen did not declare as income or pay taxes on any portion of the increases in cash value over and above the amount of his premium payments, nor did he declare as income or pay taxes on any of the 3 percent annual interest which the insurance company paid on the "prepaid premium fund." Yet, he was able to "borrow" each year against the full amount of both funds and, of course, he deducted the amount of interest which he paid on these "loans."

Golsen's annual loans (in the amounts of the cash value increases shown in column (1) above) were just sufficient to replenish the "prepaid premium fund *and* to pay approximately half of the "interest" charges on his "loans." (Column 3.) Thus, his out-of-pocket expenses were also approximately one-half of his so-called "interest" charges, and the tax savings realized by deducting the "interest" charges against his other income were (assuming a 52 percent tax bracket) just enough to generally offset the amount of his out-of-pocket expenses. It is also no coincidence that Golsen's annual out-of-pocket expense or net cash flow was found by the Tax Court to be "merely the amount that was actuarially required to pay for or support the insurance benefits available under the policies when stripped of their cash surrender values." *Id.* at 18. It was upon this basis that the Tax Court found that in reality "[s]uch 'interest' payments in fact represent the cost to the insured of the insurance benefits provided by the 'executive special' policies under the prearranged plan and do not represent payment for the use of borrowed funds." [3] Thus, the Tax Court found that the superstructure of "loans" and "interest payments" surrounding

the basic insurance transaction was sham and lacked economic substance, and that therefore the "interest payments" did not qualify as deductions pursuant to 26 U.S.C. § 163(a), as payment for the use of borrowed funds.

We agree with the Tax Court that the loan and interest transactions involved with this insurance plan lacked economic substance. The loan and interest transactions have no purpose other than the conversion of payments for insurance coverage into interest payments for tax purposes. As stated by the Tax Court,

> Golsen's "loans" were secured solely by the policies themselves and the so-called premium prepayment fund, without any personal liability on his part; the "loans" could be cancelled at any time without any cash payment, merely by appropriate offsetting book entries, and the full amount of the so-called premium prepayment fund was in fact thus "charged off" on Western's books on January 26, 1967, accompanied by a corresponding entry reducing Golsen's "indebtedness" by the amount allocable to such "fund."

In denying the Golsens' claim for refund, the Tax Court held that it was bound by the decision of this Court in Goldman v. United States, 403 F.2d 776 (10th Cir.1968), because the appeal from the Tax Court's decision could only be brought in this Court.

In *Goldman* we considered an insurance-loan program which was written by the same company, Western Security, and which had attributes similar to those present in the instant case. Involved were interest payments to Western Security which, as here, exceeded the rate paid by the insurance company on the surrender value. It was the interest

---

3. Golsen v. Comm'r, 54 T.C. 742. The court based this conclusion upon the testimony of an actuary who established to the court's satisfaction

> that the receipt and prepayment agreement and the loan agreement and assignment of policy has no essential relationship whatever to the insurance benefits provided under the insurance contracts, that when, in accordance with

> the prearranged plan, the policy was stripped of its artificially high cash surrender values, such policy was merely the equivalent of renewable term insurance, and that actuarially the net cash which the insured in fact paid to the insurance company, however described, merely represented the true cost of the insurance purchased.

> *Id.,* at 22.

transaction which was the predominant aspect and which led this Court to conclude: (403 F.2d at 778)

> The policy itself clearly reflects that the interest on the loans was 4% and the annual yield or increase in policy value was at the rate of 3%. The annual loss of 1%, when the record reveals the taxpayer was not pressed for cash, indicates a lack of economic substance in these transactions.

The Court in *Goldman* was guided by the decision of the Supreme Court in Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), in which the insurance program was devoid of substance. There it was said:

> \* \* \* For it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction. What he was ostensibly "lent" back was in reality only the rebate of a substantial part of the so-called "interest" payments. The $91,570 difference retained by the company was its fee for providing the facade of "loans" whereby the petitioners sought to reduce their 1953 and 1954 taxes in the total sum of $233,-297.68. There may well be single premium annuity arrangements with non-tax substance which create an "indebtedness" for the purposes of § 23(b) of the 1939 Code and § 163(a) of the 1954 Code. But this one is a sham.

The Tax Court rejected Campbell v. Cen-Tex, 377 F.2d 688 (5th Cir.1967), which it also deemed to be directly in point, "[d]espite some rather feeble attempts on the part of each side herein to distinguish the case adverse to it \* \* \*." We agree that we are bound by our *Goldman* decision in this case; to the small extent that *Goldman* and *Cen-Tex* are possibly distinguishable, the considerations go against the Golsens.

Appellants contend that *Goldman* and *Cen-Tex* are distinguishable inasmuch as in *Goldman* no business purpose was found, while in *Cen-Tex* the Fifth Circuit found that Cen-Tex, Inc., the corporation had procured the insurance policies to "assist in meeting the obligations of Cen-Tex under its deferred compensation plan and its obligations under the stock option and redemption agreement as well as for the general objective of having insurance upon its key employees and stockholders. \* \* \* " Assuming *arguendo* that this distinction would make a difference, Golsen's purpose of protecting his *family* from his *personal* indebtedness on business debts of corporations does not qualify as a business purpose in the same manner as Cen-Tex, Inc.'s purpose. *See also* Priester Machinery Co. v. United States, 296 F.Supp. 604 (W.D. Tenn.1969) (wherein the business purpose was to cushion the corporation in the event of its president's death and to facilitate the making of business loans).

Appellants also contend that *Cen-Tex* is distinguishable from *Goldman* in that *Cen-Tex* found economic substance in the *insurance* transaction because the net death benefits under the policy were substantial and increased from year to year. Appellant argues that after subtracting all loans against the policies, the net death benefits were substantial in amount under the policies in both *Cen-Tex* and this case, while in *Goldman* they were not. An examination of the district court opinion in *Goldman*, however, (Goldman v. United States, 273 F.Supp. 137 (W.D. Okla.1967)) does not bear this out. Regardless, however, of whether the insurance coverage as such may have had some value, we are of the opinion that the superimposed loan transactions had no economic substance, and hence the interest deduction must fail.[4]

---

4. *See* Ballagh v. United States, 331 F.2d 874, 166 Ct.Cl. 199 (1964), cert. denied, 379 U.S. 887, 85 S.Ct. 157, 13 L.Ed.2d 92 (1964), wherein the court stated, at 878:
   [P]laintiff is wide of the mark in supposing that his primary purpose of providing retirement income can make valid what would otherwise be a sham. For the transaction which we find to be a sham is not the initial insurance contract but the prepayment of all of the premiums and the loan agreement. We do not question that plaintiff's motive in buying the policy was a legitimate

One final argument advanced by appellant is that the loan transaction itself (or a part thereof) took advantage of a "loophole" in the tax law which was clearly recognized by the Internal Revenue Service, and which was not "plugged" until 1965. The 3 percent discount element of the prepaid premium deposit fund was until late in 1965 considered as nontaxable,[5] and there should not therefore be any reason to believe that the full 4 percent interest paid on money "borrowed" against that fund should not be deductible. However, this was all true in *Goldman* in which no economic substance was found; we are not disposed to overrule that decision.

 It is true that when Congress "plugged" the "loophole" involved here, it assumed that the law allowed such deductions. The Revenue Act of 1964 amended § 264 of the Internal Revenue Code of 1954 to read in part as follows:

(a) *General Rule.* No deduction shall be allowed for—

\* \* \* \* \* \*

(3) Except as provided in subsection (c), any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance \* \* \* contract \* \* \* pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise).

\* \* \* Paragraph (3) shall apply only in respect to contracts purchased after August 6, 1963.

The House Ways and Means Committee Report interpreted then existing law as follows:

one. However, the subsequent prepayment of all premiums by borrowing from the insurance company itself was not necessary in so providing retirement income, and we find that such loan transaction did "not appreciably affect his beneficial interest except to reduce his tax."
*See also* Minchin v. Commissioner of Internal Revenue, 335 F.2d 30, 32 (2d Cir. 1964).

\* \* \* [U]nder present law, no interest deductions are denied where the taxpayer purchases an insurance contract with the intention of borrowing the maximum amount on the contract each year, unless the contract falls in one of the categories described above.[6]

However, we are not bound by Congress' interpretation of prior existing law.

 The fact, however, that Congress considered it expedient to remedy an avoidance device which had at least some court recognition does not bind us in dealing with a specific fact situation.

The judgment of the Tax Court is affirmed.

5. I.T. 3513, 1941-2 CB 75; Rev.Rul. 6524, 1965-1 CB 31. The Internal Revenue Service reversed their position in Rev. Rul. 65-199, 1965-2 CB 20.

6. H.Rept. No. 749, 88th Cong., 1st Sess. 1964-1 CB (Part 2) 185. *See also* Report of the Senate Finance Committee, Report No. 830, 88th Cong., 2d Sess. 1964-1 CB (Part 2) 581.