FIRST SECURITY BANK OF IDAHO, N.A., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1197-67, 1240-71, 1241-71.    Filed March 17, 1975.

*Alonzo W. Watson, Jr.,* and *Herbert C. Livsey,* for the petitioners.

*S. Clay Freed,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: First Security Bank of Utah, N.A., docket No. 1240-71; First Security Bank of Idaho, N.A., docket No. 1241-71.

FAY, *Judge:* Respondent has determined deficiencies in the Federal income taxes of petitioners for the designated years in the following amounts: [2]

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 1197–67 [3] | First Security Bank of Idaho, N.A. | 1960 | $350,186.35 |
| | | 1961 | 170,847.59 |
| | | 1963 | 103,702.62 |
| 1240–71 | First Security Bank of Utah, N.A. | 1964 | 94,590.76 |
| | | 1965 | 185,029.55 |
| | | 1966 | 222,822.40 |
| | | 1967 | 245,542.70 |
| 1241–71 | First Security Bank of Idaho, N.A. | 1964 | 95,372.59 |
| | | 1965 | 191,660.27 |
| | | 1966 | 205,469.05 |
| | | 1967 | 268,352.32 |

As a result of concessions there remain two issues for our decision: (1) Whether the costs of a consumer credit card program are deductible as ordinary and necessary business expenses under section 162 of the Internal Revenue Code of 1954 [4] in the year 1966; and (2) the fair market value of certain property donated to the City of Nampa, Idaho, by the First Security Bank of Idaho, N.A., in 1965.

### FINDINGS OF FACT

Certain facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

At all times of import here, petitioner First Security Bank of Idaho, a national banking association (hereinafter referred to as Idaho), maintained its principal place of business at Boise, Idaho. For each of the calendar years 1965 and 1966 Idaho filed corporate Federal income tax returns with the district director of internal revenue, Boise, Idaho.

---

[2] Because of their common issues of law and fact these cases were consolidated by joint motion of the parties.

[3] A determination has been made by respondent that this petitioner was overassessed by the amount of $77,145.30 in 1962. Additionally, all issues in this docket have apparently been resolved, requiring a decision under Rule 155 of this Court's Rules of Practice and Procedure.

[4] All section references are to the provisions of the Internal Revenue Code of 1954 in effect during the taxable years in issue.

At all times of import here, petitioner First Security Bank of Utah, a national banking association (hereinafter referred to as Utah), maintained its principal place of business at Salt Lake City, Utah. For the calendar year 1966 Utah filed its corporate Federal income tax return with the district director of internal revenue, Salt Lake City, Utah.

## Issue 1. Consumer Credit Card

For some time prior to 1966, petitioners had both been engaged in commercial banking activities in their respective communities. In the said year First Security Co.,[5] which provided management services to both Idaho and Utah, decided that petitioners ought to expand and extend their installment credit operations by initiating a consumer credit card plan. To implement the above plan, Idaho and Utah each executed a licensing agreement with the BankAmerica Service Corp. (BSC), which at this time, together with the Bank of America National Trust & Savings Association, had already developed, established, and was administering a consumer credit card system (BankAmericard).[6]

The licensing agreement was, in substance, similar to arrangements BSC required of all banks entering into the Bank-Americard system. For consideration of $25,000 and royalties paid quarterly based solely on the gross volume of sales charged under the individual banks' credit card plan, petitioners received, inter alia, advertising and publicity aids, forms and agreements, training sessions in setting up and running a credit card operation, computer programing and servicing, operating manuals, and the nontransferable, nonexclusive right and license to use the service marks, BankAmericard, as well as the distinctive blue, white, and gold bands design which distinguished this plan from others.[7] For consideration of $10,000 plus the aforesaid royalty, banks that had previously

---

[5] First Security Co. was, during the period in question here, a subsidiary of First Security Corp. which was a bank holding company that owned in excess of 95 percent of the outstanding shares of stock of both Idaho and Utah.

[6] Prior to the entering into of the licensing agreements, neither Idaho nor Utah had ever established or administered a consumer credit card plan.

[7] As petitioners were associated banks owned by the same bank holding company, the $25,000 consideration referred to in the body of the opinion was in fact apportioned between Idaho and Utah, each of them paying an initial fee of $12,500.

developed local credit card systems [8] but were nevertheless desirous of the advantages of association with a nationwide organization, could receive from BSC all that the petitioners received, less the computer programing and servicing.

The license agreements executed by Idaho and Utah covered a period of 5 years and were automatically renewable for subsequent periods of 3 years each, unless terminated by notice.

Thereafter, in 1966, First Security Co. formed a BankAmericard division to handle the consumer credit card functions at Idaho and Utah, including the solicitation of merchants for membership in the system. By March 15, 1967, said division, as well as counterparts in both Idaho and Utah, were fully operational.[9]

On their corporate Federal income tax returns for 1966 both Idaho and Utah deducted, among other expenses attributable to the consumer credit card system, the $12,500 fee each of the banks had paid to BSC.[10]

Respondent, in statutory notices to Idaho and Utah, both dated November 27, 1970, disallowed the above deductions.

## Issue 2. Valuation of Land and Building

On January 12, 1965, Idaho contributed and conveyed by quitclaim deed, its entire interest in certain land and a building located in the City of Nampa, Idaho, to said City.[11] The deed was filed for record with the county recorder on behalf of the City on January 13, 1965.

---

[8] Banks that had previously developed a consumer credit card plan would have no need for the computer programing as they would have undoubtedly already designed their own.

[9] As of June 30, 1970, pursuant to mutual agreement, BSC and petitioners terminated their respective licensing agreements, BSC having sold its licensing rights in the United States to National BankAmericard, Inc. (NBI). Sec. 3.01 of article III of the bylaws of NBI required an initial service fee to banks desirous of joining the NBI system based upon the following:

| | |
|---|---|
| Reviewing, evaluating, and processing the membership application | $1,000 |
| Operating manuals, procedures, and related forms | 2,500 |
| Computer programs and related material | 20,000 |
| Training and indoctrination schools at corporate headquarters | 3,000 |
| Field training at member's headquarters: | |
| Data processing and/or operations | 2,000 |
| Management and/or marketing | 2,000 |

Petitioners, already having in operation a credit card program, paid only the reviewing, evaluating, and processing fee in order to become a member of NBI; no other expenses were incurred with respect to their membership in the BankAmericard system, except certain royalties based on credit sales volume, similar in effect to the royalties previously paid to BSC.

[10] See fn. 7 *supra*.

[11] The building had been in use by Idaho as a banking facility.

At the time of the gift the building was close to 44 years old. It had been designed by the architectural firm of Hummel & Hummel in 1919 and its construction had been completed in 1921. The piece of land upon which the building rested was entirely occupied by said building, the outside dimensions being 60 feet by 90 feet. Street improvements, including paved highways, curbs, gutters, and sidewalks were installed; and public water, sewer, power, and telephone services were available and connected.[12]

The building consisted of a full basement, a main floor, and a mezzanine. The foundation was constructed of reinforced concrete; the exterior walls were of reinforced concrete with sandstone finish;[13] the roof was steel truss with built up tar and paper cover; and the front entrance was a colonnade with pillars and glass.

Partitions throughout the interior of the building were of concrete and frame construction. The main floor of the facility was marble and the walls were of marble wainscot. Located on the main floor were counters of marble with grill detail, appropriate in a banking facility.

In October of 1964, Ken Jackson (Jackson) appraised the land and building at the request of Idaho. In making the appraisal, Jackson was unaware of Idaho's intent as to the disposition of the property.

On its Federal income tax return for the year 1966, Idaho claimed a charitable contribution in respect of the bank building and land conveyed to the City of Nampa. The petitioner asserted, in reliance upon Jackson's appraisal, that the property had a fair market value of $89,000.[14]

Respondent, by statutory notice dated November 27, 1970, disallowed the above contribution and maintained the value of the property at the time of the donation to the City to be $23,738.76.[15]

---

[12] Air-conditioning units were later installed in the building. There were, however, only two outlets, one located on each side of the front entrance.

[13] The exterior walls were 18 inches thick.

[14] The parties have agreed that no deduction is allowable for the year 1966 in respect of this transaction. Any deduction for the contribution in controversy here is properly allowable in the year 1965.

[15] Respondent now claims the fair market value of the land and building to be $35,000 at the time of the gift.

OPINION

## Issue 1. Consumer Credit Card

The issue of whether the initial costs of a taxpayer's participation in a bank credit card system are ordinary and necessary expenses, incurred in the conduct of a trade or business, deductible under section 162, has recently been decided by the United States Court of Appeals for the Tenth Circuit in *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (C.A. 10, 1974). In this instance we agree with their holding. See also *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971).

In the above-cited case the Tenth Circuit Court held that certain expenditures attributable to a bank's membership in the Master Charge consumer credit card program were currently deductible. In arriving at said conclusion the court dismissed the Commissioner's principal argument that the expenses were preoperating costs of a new business,[16] as well as his alternative contentions that the expenses were not ordinary deductible expenses since they generated future economic benefits.

With regard to respondent's argument that the expenditures incurred by Idaho and Utah in becoming part of the BankAmericard system are nondeductible preoperating costs, we think it unnecessary to rehearse the factors the Tenth Circuit considered in their holding that a bank credit card system (whether it be the Master Charge or the BankAmericard system) is but a mere extension of a bank's trade or business—financing consumer transactions; see *Colorado Springs National Bank v. United States, supra* at 1189-1192, but we concur in their reasoning and hold the same.

Respondent here alternatively argues that the costs represent nondeductible capital expenditures. He maintains that the acquisition of indicia of the BankAmericard system, including the service marks of BankAmericard, as well as certain computer programing, advertising aids, and training sessions, provide future economic benefits of an unknown duration. In support of

---

[16] If these costs had represented the preoperating costs of a new venture, unrelated to the business of banking, they would have been in the nature of capital expenditures, not currently deductible within the intendment of sec. 162. See *Richmond Television Corporation v. United States,* 345 F.2d 901 (C.A. 4, 1965). See and compare *Briarcliff Candy Corporation v. Commissioner,* 475 F.2d 775 (C.A. 2, 1973), reversing a Memorandum Opinion of this Court.

his position respondent cites several cases advocating the treatment of expenditures which bring about the acquisition of an asset having a period of useful life in excess of 1 year as capital costs.[17] See *United States v. Mississippi Chemical Corp.,* 405 U.S. 298 (1972); *United States v. Akin,* 248 F.2d 742 (C.A. 10, 1957), certiorari denied 355 U.S. 956 (1958); *Dow Corning Corp.,* 53 T.C. 54 (1969); *Glenn L. Heigerick,* 45 T.C. 475 (1966); *Radio Station WBIR, Inc.,* 31 T.C. 803 (1959).

In *Colorado Springs National Bank v. United States, supra,* the court was faced with the same argument and held that the bank's expenditures for computer operations and various promotional material and activities in starting up their consumer credit card plan were currently deductible under section 162. See *Commissioner v. Lincoln Savings & Loan Assn.,* 403 U.S. 345 (1971); see also *Cubbedge Snow,* 31 T.C. 585 (1958).[18] Under the precise facts presented here we follow their holding with regard to both Idaho and Utah.[19] See also *Jack E. Golsen, supra.*

The record in the matter before us clearly indicates that $15,000[20] of the total $25,000 of initial expenditures paid by the petitioner banks represents the cost of computer programing and servicing and is therefore within the scope of deductible expenditures approved by *Colorado Springs National Bank v. United States, supra; Jack E. Golsen, supra.* It is also quite clear that the advertising and publicity aids, forms and agreements, training sessions, and operating manuals Idaho and Utah received represent deductible expenditures. See *Colorado Springs National Bank v. United States, supra.* There remains, however, the question of whether the petitioner banks received, by payment of $10,000, the right and license to use the BankAmericard service marks and distinctive emblem, in addition to the various promotional materials cited above. If so, the cost attributable to the acquisition of said right and license will be treated as a

---

[17] If we deem the expenditures in question to be in the nature of capital outlays of indefinite duration no deduction for them will be allowed in 1966, nor will they be amortizable over any determinable period of time. See *KWTX Broadcasting Co.,* 31 T.C. 952 (1959), affirmed per curiam 272 F.2d 406 (C.A. 5, 1959).

[18] See also *Briarcliff Candy Corporation v. Commissioner, supra.*

[19] As we are in agreement with the holding in *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (C.A. 10, 1974), we make no determination as to our policy should we be faced with consolidated cases appealable to more than one circuit in which one of those circuits has spoken on a particular issue and we disagree with said circuit's position. See *Jack E. Golsen,* 54 T.C. 742, 758 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971).

[20] Each of the petitioner banks paid $7,500 of the noted sum. See fn. 7 *supra.*

nondeductible capital expenditure.[21] *Radio Station WBIR, Inc., supra* at 815.

We think the record herein sufficient to support a finding that the license to engage in and operate a consumer credit card plan under the name BankAmericard was not within the initial costs paid by Idaho and Utah to BSC. The $10,000 amount paid represents the petitioner banks' payments for support and instructional services alone.[22] The record suggests that had a bank already possessing the operational know-how of a nationwide consumer credit card system as well as computer programing adequate to maintain said system, desired to join the BankAmericard system in 1966, it would not have been required to pay any initial fees; the only payment required would have been a royalty based on gross sales volume.[23]

Therefore, in accordance with the decision in *Colorado Springs National Bank v. United States, supra,* and for the reasons indicated above, we hold the initial cost of $12,500 to each of the petitioner banks to be currently deductible under section 162.

## Issue 2. Valuation of Land and Building

We are once again asked to make a factual determination as to the fair market value of certain property at a particular period in time.[24]

To support their respective positions as to the value of the property petitioner and respondent have offered into the record the testimony of qualified real estate experts, each approaching the valuation question in a similar manner—first determining a value for the land, then the building or improvements thereon.

---

[21] The United States District Court for the District of Colorado held in *Colorado Springs National Bank v. United States,* an unreported case (D. Colo. 1973, 32 AFTR 2d 73-6175, 73-2 USTC par. 9795), that a certain $10,000 fee which in essence allowed the bank to join the Master Charge system represented a nondeductible capital expenditure. The taxpayer did not appeal from this adverse ruling on said fee, nor did the appellate court at 505 F.2d 1185 in affirming the lower court concern itself with the deductibility of the fee or any problem relating to its amortization.

[22] We note that the initial fees were nonrefundable, even if, after payment, a bank never implemented the BankAmericard system.

[23] See fn. 9 *supra* for an example of the same activity in a later year.

[24] Sec. 1.170-1(c), Income Tax Regs., states in part as follows:

(c) *Contribution in property—*(1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *

Notwithstanding the disparity between their respective judgments as to the value of the underlying land,[25] both experts arrived at a fair market value by placing heavy emphasis on various sales and leases of commercial sites in the area surrounding the land in question.

As to the building itself, respondent's expert arrived at a fair market value by estimating the rental of the structure at its highest and best use capitalized by the prevailing interest rate. After including the value of the land, certain adjustments were made to the resulting figure to account for the cost of extensive remodeling, making the edifice suitable for multiple occupancy and thereby reflecting the expert's opinion that the highest and best use of the structure was as a multiple tenant office building.[26]

Petitioner's expert, on the other hand, made a determination of value of the structure by estimating the current cost of construction of a similar building, or reproduction cost, less appropriate depreciation.[27]

After a close examination of all the factors pertinent to a decision here, and consideration of the methods and circumstances employed by petitioner and respondent in their attempts to determine value, we feel both parties have misstated the value of the property in question. It is our informed judgment, and we so hold, that the fair market value of the land and building at all times of import here was $72,000.

*Decisions will be entered under Rule 155.*

---

[25] Petitioner placed a value of $30,000 on the land alone; respondent valued said site at $23,000.

[26] Respondent also used the Market Data or Direct Sales Comparison Approach to determine the fair market value of the property as a whole. Only one sale, however, of an improved site of lesser quality was available for comparison. Accordingly, the expert made adjustments to reflect what he believed to be the price at which the comparable property would have sold had it truly been comparable.

[27] As support for the figure arrived at in the reproduction cost less depreciation approach, the expert utilized the income method of valuation, as used by respondent's expert, maintaining however the highest and best use of the building to be a public building or a single tenant. Accordingly, the expert made no adjustment for remodeling expenses.