IOWA-DES MOINES NATIONAL BANK, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE UNITED STATES NATIONAL BANK OF OMAHA, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8572-75—8573-75.   Filed September 8, 1977.

*Erwin M. Goldstein* and *Jack D. Gage,* for the petitioners.
*Burns Mossman* and *Rick Budd,* for the respondent.

FAY, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 8572-75 | Iowa-Des Moines National Bank | 1968 | $102,600.85 |
| | | 1969 | 275,971.21 |
| | | 1970 | 1,789.28 |
| 8573-75[1] | The United States National Bank of Omaha | 1968 | 54,539.97 |
| | | 1969 | 64,654.95 |
| | | 1970 | 4,696.60 |

These cases were consolidated for purposes of trial, briefing, and opinion.

Concessions having been made, we are to decide whether certain expenditures related to petitioners' participation in

---

[1] The notice of deficiency in docket No. 8573-75 included the year 1967, but matters pertaining to that year have been resolved by the parties.

the Master Charge credit card system are deductible as ordinary and necessary business expenses under section 162.[2]

### FINDINGS OF FACT

Some facts were stipulated and are so found. Petitioner Iowa-Des Moines National Bank (Iowa-Des Moines) is a national banking corporation with its principal place of business in Des Moines, Iowa, at all times relevant herein.

Petitioner the United States National Bank of Omaha (U.S. National) is a national banking corporation with its principal place of business in Omaha, Nebr., at all times relevant herein.

Petitioners each employed the accrual method of accounting for Federal income tax purposes and each filed its Federal corporate income tax returns on a calendar year basis with the Internal Revenue Service Center at Kansas City, Mo., during the years in issue.

Prior to 1968 and throughout the years in issue, petitioners were "full service" banks. As such, petitioners actively engaged in the financing of consumer transactions, the issuance of letters of credit, and the financing of merchants' accounts receivable. In 1968 petitioners decided to become card-issuing banks in the Interbank (Master Charge) system to protect their respective competitive positions in the consumer finance market.

Interbank Card Association (ICA) is a Delaware nonprofit membership corporation. ICA for many years has authorized regional associations of banks to serve as clearinghouses for transactions involving the Master Charge credit card and to perform other functions relating to such cards. MidAmerica Bankcard Association (MABA) is such a regional association formed by seven midwestern banks as a Nebraska nonprofit membership corporation in 1968. Membership of a bank in ICA or a regional association such as MABA is required of a bank to participate in the Master Charge credit card system. Each petitioner joined MABA as a full member in 1968. Membership in MABA cannot be sold or transferred except as provided in MABA's bylaws.[3]

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

[3] MABA's bylaws provide for the transfer of a bank's membership in the

As full members, each petitioner was obligated to pay MABA:

(1) A nonrefundable implementation fee of $10,000;[4]

(2) An additional fee of $1 for each cardholder account placed on the books of the association, which charge was to be a continuing one;

(3) An additional fee of $5 for each merchant account placed on the books of the association, which charge was to be a continuing one; and

(4) All additional charges assessed by the association for services and supplies provided by the association.

In addition, petitioners, as full members, agreed to make loans to the association upon request to cover deficits if necessary.[5] In return, petitioners were authorized to issue charge cards and enter into agreements with merchants and other banks which chose to participate in the Master Charge credit card system in a more limited fashion.

The economics of the credit card business are very much volume oriented, and if a bank could not foresee significant volume as a card-issuing bank, it would be unlikely to make the expenditures necessary to be in the business. For this reason a smaller bank might become an agent or limited member of MABA, rather than a full member.

Due to the nature of the credit card business and the competitive business reasons, petitioners, beginning in 1968, endeavored to sign agreements with as many agent banks as possible. To accomplish this objective, petitioners utilized letters, meetings, and personal contacts.

If a bank elected to join MABA as an agent bank, it was entitled to enroll merchants into the Master Charge system, and share with the full member bank the income derived from its acceptance of sales receipts from such merchants as it

---

association under certain limited circumstances. The record is unclear, however, as to whether the transferee bank is credited for the "implementation fee" originally paid by the transferor bank.

[4] The implementation fees paid by petitioners were used by MABA for various purposes, including the leasing of a building and computer equipment and the purchase of certain smaller equipment.

[5] Any revenues in excess of actual costs incurred by MABA were to be refunded to members so that MABA had a zero balance at the end of each year. While the record is unclear on this point, it appears that the source of such refunds did not include amounts received by MABA as implementation fees as the parties agree that such amounts were nonrefundable.

enrolled, but it could not issue charge cards. The full member bank with which the agent bank was affiliated, however, would issue charge cards to customers of the agent bank who met certain predetermined credit criteria established by it and bore all responsibility with respect thereto. The charge cards thus issued by petitioners were imprinted with the name of the agent bank involved.[6]

Pursuant to such agreements, the agent banks affiliated with each petitioner would receive $1 for the credit screening of each prospective cardholder name submitted by it to a petitioner in accordance with certain predetermined credit criteria, and to whom that petitioner actually issued a charge card. The names thus submitted by the agent banks to petitioners could not be used by petitioners for any other purpose.

By December 31 of each of the years in issue, petitioners had established the following number of agent bank relationships:

| | Number of agent banks with which petitioners had executed agreements | | |
|---|---|---|---|
| Petitioner | 12/31/68 | 12/31/69 | 12/31/70 |
| U.S. National | 0 | 207 | 218 |
| Iowa-Des Moines | 0 | 203 | 222 |

On June 18, 1969, petitioners' Master Charge programs became operational.[7]

Petitioners claimed the following expenditures which were incurred with respect to their Master Charge programs as ordinary and necessary business expenses on their Federal income tax returns for 1968:

---

[6] Similar arrangements existed between petitioners and certain limited member banks.

[7] On that date petitioner U.S. National mailed approximately 140,000 Master Charge cards to approximately 90,000 Master Charge cardholder accounts on an unsolicited basis. On the same day, petitioner Iowa-Des Moines mailed approximately 425,000 Master Charge cards to approximately 250,000 Master Charge cardholder accounts on an unsolicited basis. This practice was stopped in 1971 due to the enactment of The Truth in Lending Act. The act precluded petitioners from issuing or reissuing cards to customers who had not requested a Master Charge card or had failed to use a card which had been previously issued to the customer.

|  | U.S. National | Iowa-Des Moines |
|---|---|---|
| Implementation fee paid to MABA[8] ...... | $10,000.00 | $10,000 |
| MABA Steering Committee assessment (fee charged by MABA for entering accounts into its computer system) ................................. | 62,500.00 | 77,500 |
| Employee wages ........................................ | 19,201.64 | 30,000 |
| Total .............................................. | 91,701.64 | 117,500 |

On its Federal income tax return for 1969, petitioner Iowa-Des Moines deducted as ordinary and necessary business expenses, the following expenditures which were incurred prior to June 18, 1969, in connection with its Master Charge program:

| | |
|---|---|
| Payments to agent banks ......................................................... | $196,160.09 |
| Credit bureau searches on prospective cardholders .............. | 48,319.53 |
| Fees paid to MABA for issuance of Master Charge cards, including embossing and mailing......................................... | 54,938.26 |
| Fee to MABA for implementing initial accounts into petitioners' computer system ($1 for each cardholder and $5 for each merchant account) ..................................... | 42,500.00 |
| Processing costs paid for keypunch services to screen information on prospective cardholders submitted by agent banks ........................................................................... | 30,444.62 |
| Postage ....................................................................................... | 30,000.00 |
| Advertising and supplies—includes various signs (including small steel signs), decals, application holders, etc.[9] ........................................................................................ | 49,311.36 |
| Initial merchant supplies (operating supplies) provided to merchants ....................................................................................... | 26,780.62 |
| Salaries........................................................................................ | 60,078.14 |
| Travel and car allowance ......................................................... | 7,690.83 |
| Business development—other.................................................... | 1,319.80 |
| Rent ............................................................................................. | 1,200.00 |
| Express and courier.................................................................. | 1,438.59 |
| Total........................................................................................ | 550,181.84 |

Petitioner U.S. National deducted the following expenditures incurred in connection with its Master Charge program

---

[8] At the time of trial in this case, the "implementation fee" required of new members was $15,000.

[9] Petitioner furnished certain merchants with small enameled steel signs which were displayed on a metal frame. On its Federal income tax return for 1969, petitioner Iowa-Des Moines deducted the $14,063.40 it expended for the signs as an ordinary and necessary business expense. On its 1970 Federal income tax return, petitioner Iowa-Des Moines deducted as an ordinary and necessary business expense $4,515 for additional signs furnished to merchants. While the signs were given to merchants by Iowa-Des Moines for advertising purposes, most of the signs were soon discarded due to violations of local sign ordinances.

as ordinary and necessary business expenses on its Federal income tax returns for 1969 and 1970:

|  | 1969 | 1970 |
|---|---|---|
| Payments to agent banks ........................ | [10]$114,678.00 | $6,121.00 |
| Payments to Charge Please, a telephone solicitation concern[11] ......... | 7,349.40 | 8,115.16 |
| Total .............................................. | 122,027.40 | 14,236.16 |

Respondent has disallowed all of the foregoing deductions claimed by petitioners for the years in issue.

### OPINION

In 1968 petitioners decided to participate in the Master Charge credit card system as card-issuing banks. In implementing this decision, petitioners incurred certain initial costs during the years in issue as set forth in our findings of fact. We are to decide whether such costs represent ordinary and necessary business expenses under section 162(a). Section 162(a) provides in part as follows:

IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

With respect to the initial costs paid or incurred by petitioners during 1968 and until June 18, 1969, respondent maintains that petitioners' Master Charge activities constituted a new or separate trade or business rather than an extension of the business of banking. Therefore, concludes respondent, since such activities were not carried on by petitioners prior to June 18, 1969, the initial costs in issue incurred by petitioners prior to that date were nondeductible preoperating costs.

We have previously held that a commercial bank's participation in a bank credit card system such as Master Charge

---

[10] Of this amount $83,153 was incurred prior to June 18, 1969.

[11] Charge Please, Inc., was a business which telephonically solicited applicants for Master Charge in accordance with credit criteria supplied by U.S. National. Upon receipt of the credit data with respect to persons interested in becoming cardholders, U.S. National would determine whether the data justified the issuance of Master Charge cards to such persons. Charge Please was compensated for this service at approximately $1.85 for each application meeting certain predetermined credit criteria.

does not constitute a new trade or business, and we adhere to that position. *First Security Bank of Idaho, N.A. v. Commissioner*, 63 T.C. 644 (1975), on appeal (9th Cir. Sept. 7, 1976). Other courts which have considered respondent's argument on this point, have likewise rejected it. See *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir. 1974); *First Nat. Bank of South Carolina v. United States*, 413 F.Supp. 1107 (D.S.C. 1976), affd. per curiam 558 F.2d 721 (4th Cir. 1977); 40 AFTR 2d 77–5291, 77–2 USTC par. 9529 (1977). Accordingly, petitioners have satisfied the business requirement of section 162.

Next, respondent urges that some of the expenditures in issue incurred by petitioners prior to June 18, 1969, and the amounts in issue incurred after that date represent nondeductible capital expenditures. He maintains that costs incurred by petitioners for advertising and promotional aids, salaries, fees paid to MABA and others for initial data processing, membership fees paid to MABA, payments to agent banks and to Charge Please, and fees paid for credit bureau searches were capital in nature inasmuch as they were nonrecurrent and gave rise to assets or secured benefits having an indefinite useful life.[12]

It is often difficult to ascertain the line of demarcation between a particular expenditure which is currently deductible under section 162(a) and one which is a nondeductible capital expenditure under section 263. This is particularly true where no tangible asset or clearly identifiable intangible asset is involved. The present case is no exception.

The distinction between expenditures which are currently deductible and those which are capital in nature, is the primary function of the term "ordinary" in section 162(a). *Commissioner v. Lincoln Savings & Loan Assn.*, 403 U.S. 345 (1971).[13] Generally, expenditures to acquire assets or secure benefits which last beyond the taxable year must be capitalized. E.g., *United States v. Mississippi Chemical Corp.*, 405 U.S. 298 (1972); *Florida Publishing Co. v. Commissioner*, 64

---

[12] If we determine that these expenses are capital in nature they will not be amortizable. See *First Security Bank of Idaho, N.A. v. Commissioner*, 63 T.C. 644 (1975), on appeal (9th Cir. Sept. 7, 1976).

[13] There is no dispute in the present case that the expenditures in issue were "necessary." See *Welch v. Helvering*, 290 U.S. 111 (1933).

T.C. 269 (1975), affd. per curiam 552 F.2d 367 (5th Cir. 1977). Nevertheless, the mere presence of some possible future benefit from an expenditure is not controlling where such payment was made to promote the taxpayer's existing business and does not create or enhance a separate and distinct asset or property interest. *Commissioner v. Lincoln Savings & Loan Assn., supra; Florida Publishing Co. v. Commissioner, supra.* See *Briarcliff Candy Corp. v. Commissioner,* 475 F.2d 775 (2d Cir. 1973); *Colorado Springs National Bank v. United States, supra; First Security Bank of Idaho, N.A. v. Commissioner, supra.*

Applying these principles to the facts before us, it is clear that petitioners' expenditures for advertising and promotional aids, salaries, data processing, and credit bureau searches were merely related to the active conduct of an existing business and did not create or enhance a separate and distinct asset or property interest.[14] Furthermore, each of these expenditures involved transactions that were of common and frequent occurrence in the business of banking. Indeed, advertising by banks encouraging customers to borrow money, risk-evaluation of potential customers, the maintenance of records, and training of personnel are normal expenses of the banking business which occur each day. While it is often unnecessary in the banking business to perform a specific function more than once, it is the recurrence of the transaction giving rise to a specific entry or clerical function that is significant. See *Deputy v. DuPont,* 308 U.S. 488 (1940). For example, if a savings account is opened for a customer, a bank may never need to open it again for that customer and the individual account must be entered on the computer for the first time. Nevertheless, the transaction involves a recurring expenditure in any realistic sense. As such, the expenses are "ordinary." *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10th Cir. 1974).

Petitioners' payments to agent banks and to Charge Please, a telephone solicitation concern, should be treated no differently than other credit investigation expenditures. Despite the fact that such payments were made on a commission

---

[14] While petitioner Iowa-Des Moines distributed small enameled steel signs to certain participating merchants most of the signs were soon discarded.

basis, the record clearly indicates that credit screening was the purpose for such payments. Respondent urges that petitioners acquired something akin to a customer list as a result of such payments. He therefore concludes that the purchase price of this "asset" must be capitalized. We disagree.

While names, of course, were furnished by Charge Please to petitioner U.S. National, as well as credit information concerning such persons, this fact alone is not controlling. The names submitted by Charge Please were not those of established customers of Charge Please and their identities alone had no intrinsic value to U.S. National. Indeed, the bank could have used its own personnel and a telephone directory to obtain this information. Had it done so, the cost would have been indistinguishable from other expenditures for advertising and credit investigations, which are deducti- ble. The mere fact that it chose to hire a third party to perform such activity makes no difference.

With respect to the names supplied to petitioners by agent banks, petitioners also did not acquire any salable property interest in such names. Although the names submitted were customers of the agent banks, the contractual agreement between such banks and petitioners restricted petitioners' use of the names so furnished to "securing the acceptance and use of Master Charge Cards" which were imprinted with the name of the appropriate agent bank. Petitioners could not transfer the names to a third party or put them to any other use. Accordingly, we hold that such payments constituted ordinary expenses under section 162(a).

Finally, we consider the remaining expenditure—the $10,000 "implementation fee" paid by each petitioner to MABA in 1968. The parties have stipulated that membership in MABA or ICA was required of petitioners to participate in the Master Charge credit card system. The "implementation fee" was not limited to MABA's charter members. Thus, we are unable to accept petitioners' inference that the purpose of the fees was merely to provide MABA with operating funds during the early stages of its existence.[15] While the record is

---

[15] The record indicates that at the time of trial, payment of an implementation fee of $15,000 was necessary to join MABA.

unclear as to the effect of the restrictions on transferability of petitioners' membership in MABA, this factor must weigh against petitioners. *Welch v. Helvering,* 290 U.S. 111 (1933).

On the particular facts of this case, we believe the so-called "implementation fee" was actually a membership fee, non-refundable and paid only once. As a membership fee, the expenditure represents the cost of acquiring a distinct, intangible asset which has utility as long as petitioners elect to remain members of MABA. *Colorado Springs National Bank v. United States,* F.Supp. (D. Colo. 1973, 32 AFTR 2d 73–6175, 73–2 USTC par. 9795), affd. on other grounds 505 F.2d 1185 (10th Cir. 1974); *Mercantile National Bank at Dallas v. Commissioner,* 30 T.C. 84 (1958), affd. 276 F.2d 58 (5th Cir. 1960). We therefore sustain respondent's determination that the implementation fee of $10,000 paid by each of the petitioners was a capital expenditure.

*Decisions will be entered under Rule 155.*