**FIRST SECURITY BANK OF IDAHO, N. A., Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**FIRST SECURITY BANK OF UTAH, N. A., Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**Nos. 76–3642, 76–3643.**

United States Court of Appeals, Ninth Circuit.

March 1, 1979.

Rehearing Denied March 15, 1979.

Gary R. Allen (argued), Washington, D. C., for appellant.

Alonzo W. Watson, Jr. (argued), of Ray, Quinney & Nebeker, Salt Lake City, Utah, for appellees.

Before DUNIWAY and KILKENNY, Circuit Judges, and BELLONI, District Judge.*

KILKENNY, Circuit Judge:

In 1966 the appellees deducted as an ordinary and necessary business expense under the provisions of the Internal Revenue Code, 26 U.S.C. § 162(a), (I.R.C.1954),[1] an assessment fee paid to BankAmericard Service Corporation [BSC]. The Commissioner disallowed $12,500.00 of each bank's deductions, holding that the payment was for a franchise right of indefinite duration which must be capitalized. On review of the Commissioner's decision, the tax court found the assessment currently deductible and entered judgment for the appellees. 63 T.C. 644 (1975). The Commissioner appeals.

### FACTS

On its income tax for the year 1966, appellee, First Security Bank of Idaho [Bank of Idaho] deducted under the caption "Other Deductions", an amount of $29,794.44 as "BankAmericard Expense." On its income tax return filed for the year 1966, First Security Bank of Utah [Bank of Utah] deducted under the caption "Other Deductions", an amount of $25,000.00 as "BankAmericard fee credit." Said deductions include for each bank an amount of $12,-500.00 attributable to the items provided under the licensing agreements entered into in 1966 between BSC and said banks.

From the licensing agreements we learn that BSC was the owner, author and developer of "extensive technical information and 'know-how'" used in the establishment, administration and promotion of the BankAmericard Consumer Credit Plan. Each bank bargained for and received "technical information and 'know how' and like information as might thereafter be developed." BSC, in the agreement, promised to "cooperate with, and to instruct and assist [the bank's] representatives in the utilization of such information and 'know-how' in the establishment and administration of its credit plan." Accordingly, each bank was obligated to make only two payments to BSC: (1) a quarterly royalty payment based solely on the gross volume of sales charged under each bank's credit card plan utilizing BSC's emblems, and (2) an initial payment of $12,-500.00 for all other consideration received under the agreement by the banks from BSC. The $12,500.00 initial fee paid by each bank to BSC under the license agreement was for computer programming and servicing, operating manuals, marketing "know-how", advertising and publicity aids, forms and agreements, training sessions, and other instructions in setting up and running a credit card operation. Of this $12,500.00 fee, $7,500.00 was allotted to the costs of the computer program and all that it comprised. The other $5,000.00 was allotted to operating manuals, advertising materials, programs, marketing "know-how", and motivational programs. No part of the $12,500.00 was allotted to the use of the BankAmericard emblem.

BSC was interested in promoting the nationwide use of its credit card program and the record would indicate it was willing to foster such an extensive use by supplying the computer program at less than actual cost. There is evidence that the value of the computer program which BSC supplied to the banks under the agreement was worth well in excess of $12,500.00 and could well have cost each bank from $75,000.00 to $100,000.00 to write or rewrite the program. The operating manuals supplied by BSC to the banks were used extensively for the first few months, but soon became obsolete and had to be replaced by more sophisticated manuals. In accordance with the mutual agreement of the parties, the licensing agreements were terminated as of June 30, 1970, after being in effect not quite four years.

---

* The Honorable Robert C. Belloni, United States District Judge for the District of Oregon, sitting by designation.

1. The section reads in pertinent part:

"§ 162 *Trade or business expenses*
(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, . . . ."

## ISSUE

Whether appellees' initial cost of $12,-500.00 each for participation in the Bank-Americard system constitutes ordinary and necessary expenses incurred in carrying on a trade or business, deductible under § 162(a)?

## FINDINGS

■ Utilizing *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (CA10 1974), and *Golsen v. Commissioner*, 54 T.C. 742 (1970), aff'd. 445 F.2d 985 (CA10 1971), cert. denied 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254, as the applicable law, the tax court found that $7,500.00 of the $12,500.00 of initial expenditures paid by each bank represented the cost of computer programming and servicing and was, therefore, within the scope of the deductible expenditures approved by *Colorado Springs National Bank, supra*, and *Golsen, supra*. The record supports this finding. The tax court went on to find that the advertising and publicity aids, forms and agreements, training sessions and operating manuals the banks received represented deductible expenditures under § 162. It made this finding despite the argument of the Commissioner that: (1) the acquisition of indicia of the BankAmericard system, including the service marks of the BankAmericard, as well as certain computer programming, advertising aids, and training sessions provided "future economic benefits" of an unknown duration and, therefore, must be capitalized; and (2) that the expenditures incurred by the appellee banks in becoming part of the BankAmericard system were non-deductible preoperating costs involved in the banks' entering into a new trade or business. In rejecting both contentions, the tax court held that essentially the same questions were presented to the Tenth Circuit in *Colorado Springs National Bank, supra*, where the court held that the bank's expenditures for computer operations and various promotional material and activities in starting their consumer credit programs were currently deductible under § 162. As added support for its decision, the tax court cited *Commissioner v. Lincoln Savings & Loan Assn.*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971); *Cubbedge Snow v. Commissioner*, 31 T.C. 585 (1958), and *Golsen, supra*.

Additionally, the tax court found that the license to engage in and operate a consumer credit card plan under the name BankAmericard was not within the initial cost paid by the appellee banks. It held that the additional $5,000.00 represented each bank's payments for support and instructional services alone, noting that the initial fees were non-refundable even if, after payment, a bank never implemented the BankAmericard system. In so finding, the court suggested that had a bank already possessed the operational "know-how" of a nationwide consumer credit card system, as well as computer programming adequate to maintain the system, and had it desired to join the BankAmericard system in 1966, it would not have been required to pay any initial fees. The only payment required would have been the royalty fee based on gross sales volume.

## DECISION

We adopt the decision of the Tenth Circuit in *Colorado Springs National Bank, supra*, as the law of this circuit, and hold that the tax court correctly applied the law to the facts before it. Contrary to what is argued by the appellant, the appellees did not acquire "several new, separate assets" which are distinguishable from those acquired by the taxpayer in *Colorado Springs National Bank, supra*. Indeed, we are unable to distinguish between the "computer costs" involved in the *Colorado Springs* case and the amounts paid for a "computer program" in the case before us.

Recent cases, which we approve, fully supporting the decision of the Tenth Circuit in *Colorado Springs National Bank, supra*, are *First National Bank of South Carolina v. United States*, 558 F.2d 721 (CA4 1977), and *Iowa-Des Moines National Bank v. United States*, 68 T.C. 872 (1977). Nothing in *Lincoln Savings & Loan, supra*, is contrary to these decisions.

## CONCLUSION

█ Factual determinations of the tax court will not be set aside by the reviewing court unless it is demonstrated that such findings are clearly erroneous. *Goldstein v. Commissioner of Internal Revenue*, 298 F.2d 562 (CA9 1962); *Ferrando v. United States*, 245 F.2d 582 (CA9 1957). We hold that the findings of the tax court are not clearly erroneous and that its findings are fully supported by the record. Accordingly, the judgment of the tax court must be affirmed.

IT IS SO ORDERED.

DUNIWAY, Circuit Judge (concurring and dissenting):

I concur in Judge Kilkenny's opinion insofar as it holds that the cost to each bank, $5,000, of the operating manuals, advertising and publicity aids, programs, "marketing knowhow" and motivational programs was deductible as ordinary and necessary business expense.

I dissent as to the computer program, which cost each bank $7,500. I would hold that that cost is a capital expense, and reverse the judgment of the tax court in each case to that extent. I would hold that, under the "separate and identifiable asset test" of *Colorado Springs National Bank v. United States*, 10 Cir., 1974, 505 F.2d 1185, the computer program is such an asset, a capital asset which must be amortized over its useful life. In this respect, I conclude that the tax court's findings are clearly erroneous.

A computer program, the "deck of cards" (Tr. p. 172) that the banks bought, is a translation into computer language of a set of instructions to the computer. Each grid point can be given either a positive or a negative electrical charge. Particular sequences of charges process the factual data in the computer. When the cards are fed into the computer, the computer language on those cards causes the computer to ar-

range the factual data that it receives and stores, and to retrieve it, in particular ways. A particular use or particular uses of the data fed into the computer, and retrieved from it, is accomplished by a program properly designed to store and retrieve data in the desired manner. Thus, for example, the computer may be programmed to print out monthly bills, weekly sales volumes, etc.

Roughly analogous are a player piano and the punched paper music rolls that are used to activate it. Air entering the player mechanism through a particular hole in the roll causes the striking of a string and produces a note. An arrangement of holes, both horizontally and vertically, on the roll, can produce a Schubert sonata. If a restaurant owner bought a player piano for the entertainment of his guests, he would be required to amortize it over its useful life. If he paid a musician to play the piano live, the owner would be entitled to a deduction of his wages as an ordinary expense. If the owner then dispensed with the musician and instead purchased a repertoire of music rolls that he could insert into the piano to get music automatically, he would be required to amortize the cost of the music rolls over their useful life. On the other hand, he could deduct as expense the cost of having someone insert and remove the music rolls.

In the case at bar, the computer program, the $15,000 "deck of cards," is like the music rolls for the piano. The banks did not buy a computer program every day, or every year. Because a new program cost $175,000 to $200,000, the banks continued using the one they had bought for over five years. Thus, buying the computer program was not a "recurring expense" as that phrase is used in *Colorado Springs National Bank, supra*. For their $15,000, the banks got an intangible asset that they could and did use for over five years.[1] The $15,000 should be capitalized and amortized accordingly.

---

1. The Banks' witness Muir testified in substance that the program was used until 1971 or 1972, when the Banks and two other banks got together to purchase a new and better program for $200,000. In their brief, the Banks "vigorously assert that [if the program is a capital asset, its] useful life . . . was exhausted after five taxable years." (p. 34)

None of the cases cited in Judge Kilkenny's opinion requires a contrary result. In *Colorado Springs National Bank, supra,* what was purchased was computer services, not a computer program. The only item of cost of the six listed at 505 F.2d 1187 that might possibly be considered comparable is number 1, "Computer costs, $1,329.50, incurred to keypunch and insert its customer account data into the MSBA computer." That is, as the court said, a recurring cost. It does not appear that the bank bought any interest in the computer program. *First National Bank of South Carolina v. U. S.,* 4 Cir., 1977, 558 F.2d 721, did not involve the purchase of a computer program. Other cases cited present different problems, and are not persuasive.

I would reverse and remand as to the cost of the computer program for a determination of the appropriate rate of amortization under Revenue Procedure 69–21.