LAVON R. BULLOCK AND CAROLYN M. BULLOCK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bullock v. Commissioner
Docket No. 9278-77.
United States Tax Court
T.C. Memo 1980-135; 1980 Tax Ct. Memo LEXIS 449; 40 T.C.M. (CCH) 238; T.C.M. (RIA) 80135; April 23, 1980, Filed *449 Held, expenses incurred by petitioner Lavon R. Bullock for meals, lodgings, and transportation are not deductible under sec. 162(a), I.R.C. 1954, as travel expenses incurred "while away from home." Lavon R. Bullock, pro se. Scott W. Gray, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax in the amount of $1,565.50 for the taxable year 1975. Due to concessions by petitioners, the only issue for our decision is whether under section 162(a), I.R.C. 1954, [1] petitioners are entitled to deduct, as traveling expenses incurred while "away from home" in the pursuit *450 of a trade or business, $7,374 expended during 1975 for meals, lodging, and automobile transportation. FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts, together with exhibits attached thereto, are incorporated herein by this reference. Lavon R. Bullock and Carolyn M. Bullock, husband and wife, resided in Yuma, Ariz., when their petition in this case was filed. They timely filed a joint Federal income tax return for the taxable year ended December 31, 1975. Carolyn M. Bullock is a party herein solely because she filed a joint income tax return for 1975 with her husband. Accordingly, the term petitioner will hereinafter refer only to Lavon R. Bullock. Petitioner lived in Phoenix, Ariz., in 1974. He was an experienced electric power lineman, having worked as such on construction projects in the Phoenix area, where he was a member of the local union. On November 4, 1974, petitioner was hired as an electric power lineman by the United States Department of Interior, Bureau of *451 Reclamation (hereinafter Bureau of Reclamation), Parker-Davis Project, at Yuma, Ariz. [2] Petitioner worked as a lineman in the Yuma area throughout 1975. As of the time of trial, November 13, 1978, it appears that petitioner was still employed as a lineman in the same job, although, as a result of governmental reorganization, he then worked for the Department of Energy.Petitioner was not hired in connection with a particular construction project, rather he was employed to maintain existing electrical powerlines in the area of Yuma, Ariz. The vacancy notice which announced the position for which petitioner was hired stated that the job was "probably" one of "continuing" duration. Petitioner was aware that his job was a Federal Government career-conditional appointment which included a 1-year probationary period.He was also aware that there was no time limitation on the duration of his employment. However, having worked in the construction business for 10-12 years with the attendant *452 uncertainties concerning the length of any particular construction job and not having worked previously for the Bureau of Reclamation or in any other Federal civil service position, petitioner was uncertain what a 1-year probationary period entailed. He did think, though, that if his work was satisfactory, he would not be laid off or fired. During the period in which petitioner was hired, a career-conditional appointment was one of the most permanent types of appointments made by the Federal Government and was the same type of appointment that most employees of the Federal Government received. The probationary period had no effect on the potential duration of petitioner's employment. The period was used as a time during which it was determined if the employee had the ability to do the job, it being administratively easier to terminate an individual's employment during the first year than in subsequent years. On condition of petitioner's employment with the Bureau of Reclamation was that he move from Phoenix to Yuma so that he could be on call during the weekends to maintain powerlines. [3] Petitioner immediately looked for a home to buy in Yuma but discovered that real estate *453 prices were higher in Yuma than in Phoenix and petitioner did not believe he could afford to move immediately. Consequently, petitioner and his family did not move to Yuma until May 1976. During 1975 petitioner would drive from Phoenix to Yuma on Monday at the beginning of the workweek, stay in Yuma during the workweek, and return to Phoenix on Friday. [4] In so doing, petitioner incurred the meal, lodging, and automobile transportation expenses which are at issue in this case. Another condition of petitioner's employment, which he satisfied, was that he pass a medical examination which showed him to be fit for employment. On February 19, 1975, petitioner received another medical examination, this one being that given *454 annually to all linemen. During this examination petitioner was diagnosed as having "[questionable] early Marie Strumpel arthritis," a form of spinal arthritis. Petitioner first learned of this diagnosis sometime in March 1975. No similar diagnosis was made during the medical examination which petitioner initially passed in order to qualify for employment. On approximately March 27, 1975, petitioner's foreman showed him a rough draft of a letter, dated March 19, 1975, which proposed to terminate petitioner's employment with the Bureau of Reclamation because of his physical condition (i.e., the diagnosed arthritis). The letter was drafted by William L. Laudenschlager (hereinafter Laudenschlager), personnel director of the Bureau of Reclamation, Parker-Davis Project, and it bore the typed name of Edward M. Hallenbeck (hereinafter Hallenbeck), project manager of the Bureau of Reclamation, Parker-Davis Project, as the intended signer. The letter was never signed. Although the draft of the proposed termination letter had no "official" effect on petitioner's employment, petitioner took for granted that the letter meant what it said. Petitioner did, however, continue to work. *455 The purpose for drafting the letter and for showing it to petitioner was to provide him with advance notice of what might happen and to give him additional time to seek other employment. At that time Laudenschlager was unsure whether petitioner intended to keep his job with the Bureau of Reclamation because petitioner had not moved himself and his family to Yuma and Laudenschlager thought that petitioner might be looking for a construction job in the Phoenix area. Petitioner also thought that a major reason for the "concern" with his physical condition was to put more pressure on him to move to Yuma. On March 31, 1975, petitioner mailed to the Bureau of Reclamation a letter requesting tha he be given more time to reply to the draft of the proposed termination letter than the 10-day period set forth in the draft. By letter dated April 8, 1975, Hallenbeck informed petitioner that the draft letter of proposed termination was not an official notice of proposed termination. It was stated that the purpose for showing the draft to petitioner was to provide him with advance notice of what might occur. In April 1975 petitioner sought another medical opinion concerning his physical *456 condition. The doctor who performed this physical examination of petitioner concluded that no medical condition existed which would limit petitioner's ability to perform as an electrical lineman. Petitioner conveyed the results of this examination and the doctor's conclusion to his superiors. Petitioner was officially informed by his superiors on October 10, 1975, that his physical condition would not require termination of his employment. Petitioner was also informed that he was expected to move to Yuma so that he would be available on weekends. The information given petitioner was confirmed by letter dated October 16, 1975, and signed by Hallenbeck. The letter also stated that petitioner had to inform his superiors by October 31, 1975, concerning whether he intended to move to Yuma. By letter dated October 28, 1975, petitioner informed them that he did intend to move to Yuma. It was following his superiors' receipt and acknowledgment of his letter that petitioner for the first time believed he had a permanent job. During the same time period petitioner's 1-year probationary period ended (November 3, 1975). After he saw the draft of the proposed termination letter, petitioner *457 was more reluctant to move to Yuma because of the uncertainties concerning his continued employment with the Bureau of Reclamation due to the diagnosed arthritis. During this period petitioner's wife would check weekly with the union to which petitioner belonged in Phoenix to see if there were any construction jobs available in the Phoenix area. There were no such jobs. Following his notification in October 1975 that he was not going to lose his job because of his physical condition, petitioner made arrangements to sell his home in Phoenix. He succeeded in selling it in January 1976 but continued to occupy it as a tenant until May. Petitioner and his family moved to Yuma in May 1976 when construction was completed on a new home. On his 1975 Federal income tax return, petitioner deducted as employee travel expenses while away from home the following amounts for expenses incurred while working in Yuma: $6,570 for meals and lodging ($18 per day X 365 days); and $804 for automobile expenses ($5,360 miles X $.15 per mile). In the statutory notice of deficiency, respondent disallowed the deduction taken by petitioner for travel expenses while away from home on the grounds that *458 petitioner's employment in Yuma was indefinite, thus making Yuma petitioner's tax home for purposes of section 162(a) and precluding a deduction for the expenses since they were not incurred "away from home." OPINION The issue to be decided in this case is whether petitioner, whose family residence was in Phoenix, Ariz., may deduct as "away from home" expenses under section 162(a) amounts expended for meals, lodging and automobile transportation incurred by petitioner while working in Yuma, Ariz., and in driving between Yuma and Phoenix. Section 162(a)(2) allows a deduction for ordinary and necessary "traveling expenses (including amounts expended for meals and lodging * * *) while away from home in the pursuit of a trade or business." Thus, for a deduction to be allowed, three conditions must be met: (1) The expenses must have been ordinary and necessary; (2) the expenses must have been incurred while petitioner was "away from home:" and (3) the expenses must have been incurred by petitioner in the pursuit of business. Commissioner v. Flowers,326 U.S. 465 (1946), rehearing denied 326 U.S. 812 (1946). Although respondent argues that none of the *459 conditions have been satisfied, the principal focus of his argument is that the expenses were not incurred by petitioner while "away from home." Respondent contends that Yuma was petitioner's "home," thus precluding a deduction since the expenses were not incurred while "away" from that home. As used in section 162(a)(2), the word "home" has been consistently defined by this Court as meaning "the vicinity of the taxpayer's principal place of employment and not where his personal residence is located, if such residence is located in a different place from his principal place of employment." Kroll v. Commissioner,49 T.C. 557, 561-562 (1968); Daly v. Commissioner,72 T.C. 190, 195 (1979). In Montgomery v. Commissioner,64 T.C. 175, 179 (1975), affd. 532 F. 2d 1088 (6th Cir. 1976), it was stated: [A] taxpayer should be expected to make his home in the vicinity of his permanent business or employment and that only the expenses of traveling from a home so situated are deductible as a business expense under section 162(a)(2). If for personal reasons he fails to move his home to the vicinity of his permanent business *460 or employment, his expenses of traveling from the home are incurred for personal, not business, reasons and are not deductible. * * * An exception to this general rule is provided, however, when the taxpayer's employment away from his residence and usual place of employment is of a temporary nature rather than of an indefinite or a permanent one. Commissioner v. Peurifoy,254 F. 2d 483 (4th Cir. 1957), affd. 358 U.S. 59 (1958); Kroll v. Commissioner,supra at 562. Temporary employment has generally been defined as that for which termination within a short period of time can be foreseen. Cockrell v. Commissioner,38 T.C. 470, 479 (1962), affd. 321 F. 2d 504 (8th Cir. 1963); Albert v. Commissioner,13 T.C. 129, 131 (1949). Under such circumstances the taxpayer's tax home does not shift from the area of his residence and his usual place of employment to the vicinity of his temporary employment. Thus, petitioner is "away from home" while working at the temporary employment. In Wright v. Hartsell,305 F. 2d 221 (9th Cir. 1962), and Harvey v. Commissioner,283 F. 2d 491 (9th Cir. 1960), *461 revg. and remanding 32 T.C. 1368 (1959), the Ninth Circuit Court of Appeals (the court to which an appeal from our decision would lie, see Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971)), defined "home" for section 162(a), purposes to mean the taxpayer's residence and utilized a somewhat different test for determining whether a taxpayer who accepts employment away from that home is entitled to a deduction under section 162(a)(2) for expenses such as incurred in this case. In general, that test was whether it was reasonable to expect the taxpayer to move his residence to the area of his employment. The Second Circuit has adopted a similar approach. Six v. United States,450 F. 2d 66 (2d Cir. 1971); Rosenspan v. United States,438 F. 2d 905 (2d Cir. 1971). It is presently unclear what continuing vitality Wright and Harvey have in view of subsequent decisions. See Coombs v. Commissioner,608 F. 2d 1269 (9th Cir. 1979), affg. in part and revg. and remanding in part 67 T.C. 426, 474-475 (1976); *462 Wills v. Commissioner,411 F. 2d 537 (9th Cir. 1969), affg. 48 T.C. 309 (1967); Sanders v. Commissioner,439 F. 2d 296 (9th Cir. 1971), affg. 52 T.C. 964 (1969); see also Folkman v. United States,     F. 2d     (80-1 USTC par. 9298) (9th Cir. 1980). [5] In addition to this uncertainty, it is also unclear what effect the different approaches of this Court and of the Ninth Circuit have. The same factors utilized to determine whether a particular employment is temporary or indefinite will also be used to determine whether it is reasonable to expect the taxpayer to move his residence to the area of his employment.See Montgomery v. Commissioner,supra.
Furthermore, this Court has also analyzed the temporary-indefinite question in terms of whether it would be reasonable to expect the taxpayer to move his residence to the area of his employment. Kroll v. Commissioner,supra at 562; Tucker v. Commissioner,55 T.C. 783 (1971). It is unnecessary to explore this question *463 any further, however, because we conclude that the application of either this Court's or the Ninth Circuit's approach leads to the same result in this case. The question of the location of petitioner's tax home is one of fact. Commissioner v. Flowers,supra;Commissioner v. Peurifoy,supra. The necessary inquiry must be made at the time the employment begins. Commissioner v. Peurifoy,supra;Gardin v. Commissioner,64 T.C. 1079, 1084 (1975); Dilley v. Commissioner,58 T.C. 276, 281 (1972). [6]
Petitioner and his family resided in Phoenix, Ariz., when he accepted employment as an electric power lineman in November 1974, and we will assume that was his tax home at the time. Petitioner was hired in November 1974 as an electric power lineman to maintain existing electric powerlines in the area of Yuma, Ariz. He was not hired in connection with a particular construction project such that he could expect his employment to terminate at the end of the project. Petitioner's position was a Federal Government career-conditional *464 appointment, the duration of which had no time limitation. Furthermore, he was informed that he was expected to move to the Yuma area in order that he would be available for work on weekends if the need arose. No evidence was introduced to indicate that when he accepted the employment, petitioner intended to work for only a short period of time. Based on these facts it can only be concluded that petitioner's employment was indefinite at its inception. Phrased another way, it was reasonable to expect petitioner to move his residence to Yuma at that time. Whatever uncertainties petitioner may have had at the inception of this employment concerning its duration, they do nt appear greater than one would expect a person beginning a new job to have. Petitioner believed that if his work was satisfactory he would not be laid off or fired. Furthermore, petitioner was not so uncertain about the duration of his employment as to prevent him from exploring the housing market in Yuma in early 1975. He did not move because he did not think he could afford to do so. While this conclusion may have been due in part to job uncertainties, we believe the principal reason was the higher cost of *465 homes in Yuma and the unfavorable selling market in Phoenix. [7] Such a purely personal reason is unrelated to whether petitioner's employment was temporary or indefinite. Having decided that petitioner's employment at its inception was indefinite and it was reasonable to expect him to move his residence to Yuma at that time, the question then becomes what effect, if any, did the development in March-April 1975 of a question concerning petitioner's medical condition have. We conclude that it had no effect on the issue before us. Prior to the time petitioner was notified of his possible medical infirmity, petitioner's tax home had become Yuma. For personal reasons, petitioner had not moved his residence to Yuma. Had he done so, this issue would not have arisen. Looking at petitioner's position at the time he was shown the letter on March 27, 1975, and judging from the actions he took thereafter in protest, we think it highly unlikely that petitioner would have moved back to Phoenix had he been living in Yuma at the time. *466 He continued to work in Yuma, was advised on April 8 that the letter was not official, and was advised by a physician shortly thereafter that he had no physical problem that would interfere with his work. Petitioner has in fact continued to work and live in Yuma until the time of this trial. In other words, it is only because petitioner chose not to move at the time he was first employed that the notification of a possible physical infirmity enters into the issue at all. Under such circumstances, we do not believe the March-April development should be retroactively considered in determining whether petitioner's job in Yuma was temporary or indefinite at its inception. Gardin v. Commissioner,supra at 1082-1083. We need not answer the question whether, as a matter of law, indefinite employment can at some point become temporary because, for the reasons recited above, we do not believe the circumstances would have justified petitioner in changing his tax home back to Phoenix. In other words, we do not believe the circumstances converted petitioner's job from a job of indefinite tenure to a temporary job. Petitioner was in no different position during the *467 March-April period of 1975 than any other employee who, as a result of a routine annual physical exam, is advised that he might have a physical infirmity that might cause his employment to be terminated in the future.[8]
Accordingly, we conclude that petitioner's employment in Yuma was indefinite throughout 1975 and that petitioner was not "away from home" while working there. Thus, petitioner cannot deduct pursuant to section 162(a)(2) the expenditures in issue for meals, lodging, and transportation. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise indicated.↩
2. Other than generally indicating that he had been employed in the construction business, no specific evidence was introduced concerning petitioner's employment immediately prior to November 1974.↩
3. This condition was not listed on the vacancy notice which announced the position for which petitioner was hired. Apparently, petitioner was verbally informed of the condition when he was hired. ↩
4. No evidence was introduced concerning whether prior to the time petitioner moved his residence to Yuma the need arose for petitioner to work on weekends, or, if such need in fact arose, what occurred as a result of petitioner being in Phoenix rather than Yuma.↩
5. See also Hillgren v. Commissioner,T.C. Memo. 1980-101↩.
6. Hallstein v. Commissioner,T.C. Memo. 1978-33↩.
7. There is also some suggestion in the record that petitioner did not think he should be on call during weekends because he was not paid to stand by.↩
8. We can hazard a guess, as did petitioner, that the draft letter was shown to him more to convince him to move to Yuma than to threaten him with termination because of a physical condition. If this caused petitioner real concern, it is unfortunate. But we believe petitioner well knew by this time that it was expected, as a condition of his employment, that he would move to Yuma at an early date. His failure to move to Yuma in 1974-75 did not make petitioner's job temporary at its inception--his own choice not to meet that condition may have, at best, produced some uncertainty subsequent thereto.↩