T.C. Memo. 1996-437


UNITED STATES TAX COURT


ROBERT C. AUSTIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5429-95.                    Filed September 25, 1996.


<u>Merle R. Flagg</u>, for petitioner.

<u>James F. Prothro</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARKER, <u>Judge</u>:  Respondent determined deficiencies in, and additions to, petitioner's Federal income tax as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651 | Sec. 6653(a) | Sec. 6654 | Sec. 6661 |
| 1984 | $8,723 | $2,174 | [1]$444 | --- | $2,181 |
| 1985 | 7,871 | 1,929 | [1]406 | --- | 1,968 |
| 1986 | 10,899 | 2,678 | [1]548 | --- | 2,725 |
| 1987 | 20,519 | 5,130 | --- | --- | --- |
| 1988 | 52,421 | 8,158 | --- | 3,353 | --- |
| 1990 | 11,351 | 2,838 | --- | 747 | --- |
| 1991 | 18,310 | 4,578 | --- | 1,053 | --- |

[1] Plus 50 percent of the interest due on the deficiency.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue to be decided is whether petitioner's remittance in the form of a check in the amount of $19,789.96, sent to the Internal Revenue Service with petitioner's 1988 Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, on or about April 15, 1989, was a payment of tax or a deposit in the nature of a cash bond.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner resided in Greeneville, Tennessee, at the time he filed his petition in this case. In 1984, petitioner was 38 years of age. Up to that time he had led a very sheltered and privileged life. He had no idea what his assets were and no idea

what his income was. His father, a very successful businessman, handled all of petitioner's investments and financial matters and provided petitioner and his two sisters with a "protected and cocooned life".

During the years at issue, petitioner was an orchestra conductor. Sometime in 1984, petitioner moved from Chattanooga, Tennessee, to Cheyenne, Wyoming, to conduct the Cheyenne Symphony Orchestra. In approximately 1986, petitioner left Wyoming and moved to Texas in order to conduct the East Texas Symphony Orchestra in Tyler, Texas. Occasionally, petitioner made guest appearances conducting other orchestras. During 1988, petitioner's principal job was conducting the East Texas Symphony Orchestra. Petitioner's income from conducting in 1988 was approximately $43,000, the highest amount petitioner had ever earned from conducting and what he considered a "handsome salary" by the standards of his profession. In 1989, petitioner was fired from his job with the East Texas Symphony Orchestra, and thereafter he moved from Lindale, Texas, to Dallas, Texas.

A significant portion of petitioner's income derived from investments his father had made in petitioner's name, including securities and rental property. Petitioner did not receive the income from these investments directly. The income was held in an account at ROLICH, a corporation organized by petitioner's father as a holding company to manage the assets that the father had purchased and placed in the names of his three children. The

name ROLICH was derived from the names of the three children: Robert, Lisa, and Christine. When petitioner needed money for any reason, his father wired the funds to him. ROLICH was a family corporation, and each of the five family members (i.e., petitioner's father, mother, and the three children) was an officer of ROLICH.

In 1987, petitioner's father participated in a leveraged buy out of UNAKA Corp. (UNAKA) and obtained petitioner's signature pledging petitioner's assets in this buy out. Petitioner was unaware at that time that he owned substantial assets. Petitioner and his sisters were named directors and officers of UNAKA and were given annual salaries of $20,000 each. After his father's death, in 1990, petitioner learned for the first time that he was an owner of UNAKA and that he was liable for a debt of $40 million for the buy out. UNAKA owned a number of subsidiary companies, including Metals Engineering Company (MECO), a company which manufactured metal folding furniture, and Southern Packaging Company (SO-PAK), a company which produced packaged military food rations. Any dividends from MECO or SO-PAK would have been paid to UNAKA as sole shareholder. Petitioner does not know if he was an officer of MECO or of SO-PAK during 1988. During 1988, petitioner was paid $20,000 in compensation from UNAKA as a director or officer; petitioner did not receive this compensation directly and did not learn of it

until later.  Petitioner estimates he may have received a couple of hundred dollars of dividend income from UNAKA in 1988.

Petitioner was also a stockholder of the Austin Company. The Austin Company was in the tobacco business and was the company that petitioner's father worked for prior to his retirement and the purchase of UNAKA.  Petitioner is unsure if he received dividends from the Austin Company in 1988.  Petitioner was not on the board of directors or an employee of the Austin Company.

Petitioner's father had caused a restaurant to be constructed and had placed the property in petitioner's name. This restaurant was the source of rental income to petitioner during some of the years at issue.  As of April 15, 1989, petitioner knew that the restaurant was being rented, although he was unaware of the amounts of rental income or expenses.

The only investment that petitioner ever made on his own was the purchase of two condo time-shares located in Vail, Colorado. Rental activity was sporadic, and petitioner ultimately disposed of the time-shares at a loss.  Petitioner had purchased a house in Wyoming as his residence while he worked there, and, similarly, he had purchased a house in Lindale, Texas, when he went to work for the East Texas Symphony Orchestra.  Petitioner may have rented out one or both of these residences after he moved out.  None of the real properties that petitioner himself purchased produced any rental income during 1988.

In 1988, petitioner's father borrowed approximately $60,000 to $70,000 in petitioner's name in order to purchase securities for petitioner. Petitioner was not aware of these transactions until respondent's audit examination of the years before the Court.

Petitioner's grandfather had established a trust for the benefit of his grandchildren. Petitioner's share of the income from this trust went to petitioner's father. Petitioner was unaware of this trust until respondent began the audit examination.

Petitioner's father had a power of attorney to act on petitioner's behalf. The records regarding petitioner's various sources of income, including Forms 1099 and W-2, were mailed to petitioner's father in Tennessee. Petitioner's tax returns for all of his taxable years up through 1983 had been prepared by his father. Petitioner for some reason copied the returns over in his own handwriting and then signed them. Petitioner's tax returns for the taxable years 1981 through 1983 reported no tax liability.

Around 1984 petitioner's mother became seriously ill. She spent about half of her time in the hospital. Petitioner's father stayed with her while she was hospitalized during her illness. Apparently as a result of the mother's illness, petitioner's father ceased the preparation of petitioner's tax

returns.[1]  The mother's condition continued to worsen, and she died in August of 1989.  Petitioner's father died approximately a year after his mother's death, in August of 1990.

As of April 15, 1989, petitioner had not filed a Federal income tax return since his return filed for the taxable year 1983.  Petitioner was aware that a Federal income tax return is required to be filed for each year by April 15 of the following year.  On April 15, 1989, petitioner prepared and mailed Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return (Form 4868), for the taxable year 1988.  Petitioner entered the following figures on the Form 4868:

|  |  |
|---|---|
| Total tax liability | $22,345.00 |
| Federal income tax withheld | 2,555.04 |
| BALANCE DUE | 19,789.96 |

Petitioner enclosed with the 1988 Form 4868 a check in the amount of $19,789.96 (the remittance) to the Internal Revenue Service (IRS).  Petitioner obtained $15,000 of the funds used for the remittance from his account at ROLICH.  The memo line on the check was blank.  In petitioner's check register, he noted that the check was to IRS for "88 taxes".  Petitioner had initially written the amount of the remittance in the check register as $19,600, but he crossed out that figure and then wrote in $19,789.96.  He made the change because he thought the round

---

[1]  However, the father remained active in managing his and petitioner's investments.  The leveraged buy out of UNAKA occurred in 1987, and the loan to buy securities for petitioner occurred in 1988.

figure "looked too pat," and he wanted to change it to something that he felt "looked more logical".  Petitioner sent the check to the IRS because if he owed any tax he wanted it to be paid.

It was petitioner's intent in April of 1989 that if there were any taxes due for 1988, the remittance would pay for those taxes, or for any that might be due for the next year or the previous year.  He wanted to be able to show "that I was not trying to dodge my taxes, that I was trying to keep everything paid."  He hoped that someday his father "would be able to go back and deal with all this, that there would have not been any liability to trigger any concern that there was an attempt to not pay."

The IRS received petitioner's 1988 Form 4868 and the remittance and granted petitioner an extension of time to file until August 15, 1989.  The IRS posted the remittance as a payment for the taxable year 1988 and has always treated the remittance as a payment of taxes.  That remittance was never placed into a suspense account or an excess collection account, and it was never treated by IRS as a deposit in the nature of a cash bond.  The amount of the remittance has been shown on petitioner's 1988 account as a payment since it was received by the IRS.  As of the time of trial, no assessment had been made for the taxable year 1988, and petitioner's 1988 account still showed a credit balance of $19,789.96.

Petitioner did not timely file his 1988 return or the returns for the other years involved in this case, although he did cooperate with respondent's agents during the audit in 1993 and 1994. On January 9, 1995, respondent mailed three notices of deficiency to petitioner: one notice for the taxable years 1984 through 1986; another for the years 1987 and 1988; and the third for the years 1990 and 1991. On April 1, 1995, petitioner prepared his 1988 tax return, and on April 7, 1995, he filed that return and returns for the other years. He filed his petition in the Tax Court on April 10, 1995, challenging all of the adjustments in the three notices of deficiency.

During the trial session in Dallas, Texas, commencing February 26, 1996, the parties filed their stipulation of agreed issues that settled all issues in the case except one, leaving for trial and for the Court's decision only the question of the characterization of the remittance as a tax payment or a deposit. It was during the settlement negotiations and the drafting of the parties' stipulation of agreed issues that petitioner for the first time raised the issue that the remittance was a deposit in the nature of a cash bond.

## OPINION

This Court has jurisdiction to determine the existence and amount of any overpayment of tax to be credited or refunded for the year or years at issue. Sec. 6512(b)(1). However, section 6512(b)(3) limits the amount of the allowable credit or refund

based on the time of payment of the tax. Where no return has been filed, and no claim for a refund has been made, prior to the issuance of the notice of deficiency, the amount of the refund is limited to those amounts paid either (1) after the mailing of the notice of deficiency or (2) within the 2-year period prior to the date of the mailing of the notice. Secs. 6512(b)(3), 6511(b)(2); Commissioner v. Lundy, 516 U.S. ___, ___, 116 S.Ct. 647, 652 (1996); Gabelman v. Commissioner, 86 F.3d 609, 611 (6th Cir. 1996), affg. T.C. Memo. 1993-592.

In the instant case, petitioner filed no return and made no claim for a refund prior to the mailing of the notice of deficiency. The amount of petitioner's refund as determined by this Court is limited to the amount of 1988 taxes paid in the 2-year period preceding the mailing of the notice of deficiency on January 9, 1995.[2] The remittance was mailed to the IRS on April 15, 1989. If the remittance constituted a payment of tax, rather than a deposit, the refund of that amount is barred. Gabelman v. Commissioner, supra at 611. Respondent argues that the

---

[2] The parties have not suggested that any payments were made after the notice of deficiency was mailed. However, consistent with petitioner's argument that the remittance was a deposit in the nature of a cash bond, it may be that petitioner regards the date of filing of his 1988 tax return, on April 7, 1995, as the date of payment and hence the date of overpayment of his tax. See Risman v. Commissioner, 100 T.C. 191, 194, 203 (1993). For this Court to have subject matter jurisdiction, there must first be a payment of tax before this Court can determine the existence and amount of any overpayment under sec. 6512(b). See Johnson v. Commissioner, T.C. Memo. 1993-562.

remittance was a payment of tax, whereas petitioner argues that it was a deposit in the nature of a cash bond.

In Risman v. Commissioner, 100 T.C. 191, 197 (1993), an earlier case involving a taxpayer's remittance with a Form 4868, this Court stated that "A remittance by a taxpayer to respondent generally will not be regarded as a payment of Federal income tax until the taxpayer intends that the remittance satisfy what the taxpayer regards as an existing tax liability." We concluded that "remittances made by taxpayers with Form 4868 extension requests are not necessarily to be treated, as a matter of law, as payments of tax as of the filing date of the associated income tax return". Id. at 203. We applied instead a facts and circumstances test in ascertaining the taxpayer's intent.

In Risman v. Commissioner, supra, the taxpayers made a remittance with a Form 4868 in an amount of $25,000 that bore no good faith relationship to the taxpayers' tax liability for the year specified, i.e., an arbitrary, disorderly, or random remittance. The IRS treated the remittance as a deposit by placing it in a suspense account upon receipt. The taxpayers wrote to the IRS approximately 14 months later indicating that the remittance had not been based on any estimate of their tax liability for that year and that they expected the remittance would be applied to future taxes owed on tax returns not yet filed. At the time of their letter, the taxpayers were delinquent in filing the return for the year specified on the

Form 4868 and had requested an extension for the subsequent year's return. Based on those facts and circumstances, we held that the taxpayers' remittance was a deposit.

In the instant case, petitioner changed the amount of the remittance from a round figure of $19,600 to $19,789.96. He did not want the amount of the remittance to look "too pat". He changed the figure to $19,789.96 so that it would look "more logical". In other words, petitioner wanted the amount of the remittance to appear to be a valid, rather than a made-up, figure. Respondent treated petitioner's remittance as a payment of tax. Petitioner never contacted respondent regarding the treatment of the remittance. During 1993 and 1994, when petitioner was cooperating fully with respondent's agents in the audit, he never suggested that the remittance was merely a deposit. Shortly before trial, when the parties made their calculations in connection with their settlement negotiations, petitioner for the first time raised the issue as to whether the remittance was a payment of tax or a deposit.

Under the Golsen rule, "where the Court of Appeals to which appeal lies has already passed upon the issue before us, efficient and harmonious judicial administration calls for us to follow the decision of that court." Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). An appeal in this case would lie to the Court of Appeals for the

Sixth Circuit, which has now spoken definitively on the issue in this case.

After the parties submitted their briefs in the present case, the Court of Appeals for the Sixth Circuit affirmed our decision in Gabelman v. Commissioner, T.C. Memo. 1993-592, in which the taxpayer voluntarily and in good faith prepared his extension request and the accompanying check, and based on the facts and circumstances, this Court held that the taxpayer's remittance was a payment of tax. Gabelman v. Commissioner, 86 F.3d 609 (6th Cir. 1996). The Court of Appeals affirmed, however, on the ground that remittances submitted with Forms 4868 are payments of tax as a matter of law. Id. at 611-612.

The Court of Appeals for the Sixth Circuit reasoned that "The express language of the regulations[3] requires taxpayers to submit an estimated payment of their taxes with Form 4868 extension requests" (emphasis in original) and also that such remittances are analogous to the withholding of taxes and payment of estimated taxes throughout the year, which are deemed paid on April 15 of the following year and the due date of the return, respectively, under section 6513(b). Id. at 612. The Sixth Circuit rejected the contrary conclusion we had reached in our opinion in Risman v. Commissioner, supra. Also, the Court of Appeals for the Sixth Circuit distinguished the situation in

_____

[3] The regulations referred to are sec. 1.6081-4(a)(4) and 1.6081-4(b), Income Tax Regs.

Gabelman v. Commissioner from that in Ameel v. United States, 426 F.2d 1270 (6th Cir. 1970), where the Sixth Circuit itself had previously applied a facts and circumstances test in deciding whether a taxpayer's remittance made during an audit qualified as a deposit or payment.  Gabelman v. Commissioner, supra at 612-613.

Following the Golsen rule and applying the holding of the Court of Appeals for the Sixth Circuit set forth in Gabelman v. Commissioner, supra, that remittances submitted with Form 4868 extension requests are payments of tax as a matter of law, we hold that the remittance in this case was a payment of tax, not a deposit.

In accordance with the parties' stipulation of agreed issues and the above holding,

An appropriate decision will be entered.