T.C. Summary Opinion 2002-7


UNITED STATES TAX COURT


ESTATE OF KEITH L. GURR, DECEASED,
MARY JULENE WOODEN, GENERAL PERSONAL REPRESENTATIVE,
AND DELMA P. GURR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7194-99S.          Filed January 30, 2002.


<u>Bradley S. Shannon</u>, for petitioner Delma P. Gurr.[1]

<u>R. Craig Schneider</u>, for respondent.


COUVILLION, <u>Special Trial Judge</u>:  This case was heard

pursuant to section 7463 in effect when the petition was filed.[2]

---

[1]    At the time of the trial, petitioner Keith L. Gurr was represented by counsel.  When the estate was opened, his counsel filed a Motion For Withdrawal, which was granted.

[2]    Unless otherwise indicated, section references hereafter are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and accuracy-related penalties as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|------------------|-----------|
| 1992 | $ 1,489 | $ 372 | $ 298 |
| 1993 | 10,330 | 2,583 | 2,066 |

At trial, the parties filed a written stipulation, wherein petitioners conceded the above deficiencies, additions to tax, and the accuracy-related penalties.[3]  The only issue for decision is whether Delma P. Gurr (petitioner) is entitled to relief from joint and several liability under section 6015 for the years at issue.[4]  More specifically, petitioner seeks relief under section 6015(b), alternatively, limited liability relief under section 6015(c), and, in the further alternative, relief under section

---

[3]  After the case was heard and taken under advisement, Keith L. Gurr died, and the Estate of Keith L. Gurr, Deceased, Mary Julene Wooden, General Personal Representative, was substituted as petitioner.  Because of his health, Mr. Gurr did not appear at trial or present any evidence.

[4]  Sec. 6015 was enacted by sec. 3201(a) of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 734, and is effective with respect to any tax liability arising after July 22, 1998, and any tax liability arising on or before July 22, 1998, that is unpaid on that date.

6015(f).  Respondent and Keith L. Gurr (Mr. Gurr) opposed petitioner's claim.  However, in a posttrial reply brief, respondent conceded petitioner's entitlement to limited liability relief under section 6015(c) to the extent of 50 percent of the deficiencies attributable to three adjustments in the notice of deficiency for 1992 and four notice of deficiency adjustments for the year 1993 relating to certain real estate transactions. Respondent made no concession with respect to one adjustment in the 1993 notice of deficiency relating to the taxable portion of Social Security benefits received by petitioners that year. Given the concession of respondent, petitioner, nevertheless, maintains her entitlement to total relief under section 6015(b), (c), and (f).

Some of the facts were stipulated.  Those facts, and the annexed exhibits, are so found and are incorporated herein by reference.  At the time the petition was filed, Mr. Gurr's legal residence was Sandy, Utah, and petitioner's legal residence was West Jordan, Utah.

Petitioner and Mr. Gurr were married in 1952.  Their marriage lasted 43 years.  They separated on November 4, 1993, and were divorced on August 29, 1995.  They had five children. Petitioner had one other child from a prior marriage.

Respondent issued separate notices of deficiency to petitioner and Mr. Gurr, and a joint petition was filed timely.

Petitioner thereafter filed an amended petition to assert her claim for relief under section 6015.

Mr. Gurr had a tenth-grade education. Throughout their marriage, he was self-employed. For several years, he operated a coal business, wherein he purchased and delivered coal to customers. At one time, he and petitioner operated a commercial horse riding stable. Petitioner assisted in the operation of this business. Later, Mr. Gurr went into the real estate business, wherein he purchased and held land, either for resale or development. This was the activity Mr. Gurr was engaged in during the years at issue. That activity was the principal source of income of petitioner and Mr. Gurr during 1992 and 1993. At the time of trial, Mr. Gurr was 77 years of age, and both he and petitioner had been retired for several years.

Petitioner was a high school graduate and attended Brigham Young University for a short time. She did not receive a degree from that institution. During World War II, petitioner served 2 years in the women's branch of the U.S. Navy which, at that time, was known as the WAVES. Other than assisting in the operation of the riding stable business, she was never employed outside the home during her marriage with Mr. Gurr.

Petitioners filed joint Federal income tax returns for 1992 and 1993. For each year, the income and expenses from Mr. Gurr's real estate activity were reported on Schedule C, Profit or Loss

From Business, of the return. Petitioners reported Schedule C losses of $36,747 and $12,668, respectively, for 1992 and 1993. In the notices of deficiency, respondent made no adjustments to the Schedule C income and expenses reported by petitioner and Mr. Gurr on their 1992 and 1993 returns, thereby allowing the losses claimed. Each of the 1992 and 1993 tax returns also included a Schedule D, Capital Gains and Losses, with respect to certain real estate transactions. On the Schedule D for 1992, among other transactions reported on that Schedule, petitioner and Mr. Gurr reported a long-term capital loss of $173,387 from two real estate transactions. On that same Schedule D, petitioner and Mr. Gurr reported a long-term capital gain of $7,768 from a separate real estate transaction. In the notices of deficiency, respondent disallowed the $173,387 long-term capital loss for lack of substantiation. Respondent also determined that the reported $7,768 long-term capital gain constituted ordinary income to the extent of $6,925.

On their 1993 return, petitioner and Mr. Gurr claimed a Schedule D short-term capital loss of $1,000 from the sale of real estate, a long-term capital loss of $16,400 as guarantors on two notes, and long-term capital gains from installment sales of $12,673. In the notices of deficiency, respondent disallowed these two losses for lack of substantiation. Respondent further determined that $1,082 of the Schedule D long-term capital gain

of $12,673 constituted ordinary income.

Finally, on their 1993 return, petitioner and Mr. Gurr claimed a $158,841 net operating loss carryover from 1992. That carryover loss claimed on the 1993 return was disallowed in the notices of deficiency because the adjustments to the 1992 tax return fully eliminated any carryover loss to 1993.

As a result of the adjustments to the 1993 return, respondent determined that $3,936 in Social Security benefits received by petitioner and Mr. Gurr constituted taxable income.

Petitioner was not involved in keeping the books and records for the real estate activity. However, she was familiar with the manner in which Mr. Gurr maintained his records. His system of record keeping was simply retaining receipts and other documents accumulated over the year, which he gathered up at the end of each year and took to their accountant to be sorted out for income tax purposes. Petitioner knew, however, that Mr. Gurr's system of record keeping was deficient in many respects, as evidenced by the fact that substantially all the adjustments in the notices of deficiency were based upon the failure to substantiate the amounts claimed on their joint returns as capital gain losses and the failure to substantiate the character of their reported capital gains. At trial, petitioner testified: "The whole reason we are here today is because of Keith Gurr's poor record keeping." That testimony was corroborated by

petitioner's daughter, who testified at trial on behalf of petitioner.

Although petitioner was not involved in the day-to-day conduct of the real estate business, over the years she was a party to many transactions in the acquisition and sales of property and, in several instances, in instituting legal actions with Mr. Gurr in connection with land titles. Several tracts of land were acquired in her name alone and others jointly with Mr. Gurr. The Court is satisfied from the evidence that petitioner's name on these deeds was not for nominal purposes. For example, in 1991, Mr. Gurr filed an individual petition for relief under Chapter 11 of the Bankruptcy Code. Prior to institution of the proceeding, he arranged with petitioner to have certain real estate transferred to her in order that such property would be beyond the reach of his creditors.[5] Petitioner knew and understood that to be the purpose of the transfer. During the course of the bankruptcy proceeding, Mr. Gurr petitioned the court for the sale of a certain tract of real estate in which petitioner owned a one-half interest. That sale was a $455,000 transaction. Petitioner consented to the sale on the condition that her interest in the sales proceeds be protected. She also consented to the use of some of the proceeds for payment of

---

[5] There is no indication in the record that Mr. Gurr's creditors challenged the validity of the transfer.

secured claims owing by Mr. Gurr.  There are other instances where petitioner and Mr. Gurr filed a joint action to clear the title to certain property they owned or subordinated mortgage rights on certain properties to inferior creditors.  During 1993 alone, petitioner sold her interests in at least nine separate real estate properties.

The marriage between petitioner and Mr. Gurr was not harmonious.  Petitioner and her daughter both testified that, over the years, Mr. Gurr was abusive both physically and mentally to petitioner and the children.  Petitioner was not allowed any role in the family finances, nor did Mr. Gurr keep petitioner informed on their finances or how well the real estate activity was doing.  Mr. Gurr's allowances to petitioner for the household and furnishings for the children were meager.  Oftentimes, Mr. Gurr threatened petitioner to obtain her signatures on various documents in connection with the real estate activity.  In spite of these shortcomings, the marriage lasted for 43 years.

At the time of the divorce, a considerable amount of real estate was owned by petitioner and Mr. Gurr.  Several tracts were in petitioner's name, and others were in the joint names of petitioner and Mr. Gurr.

On October 24, 1995, the State court having jurisdiction of the divorce proceeding approved a property settlement between petitioner and Mr. Gurr.  In that settlement, petitioner was

allotted an undivided half interest with Mr. Gurr in 2,337 acres of land. Several other tracts of undisclosed acreage were allotted to petitioner in full ownership. The family home was allotted to Mr. Gurr, and petitioner was allotted a lot and mobile home, where she established her residence. Petitioner also was awarded $25,041.17 in cash, an additional amount of $46,000 to be paid by Mr. Gurr over 2 years, and, finally, $39,768 due on installments from prior sales of real estate. Mr. Gurr was ordered to pay $7,226 to petitioner's divorce attorney. The agreement provided that neither party was liable for alimony.

In an order by the same court dated October 24, 1995, entitled Additional Findings of Fact and Conclusions of Law, the court stated:

2. The parties have acquired the following personal properties during their marriage:

     \*     \*     \*     \*     \*     \*     \*

(d) The tax loss carryforward as reported on the <u>1994</u> tax return is an <u>asset</u> of the parties and should be divided equally for future years. [Emphasis added.][6]

---

[6] The court's order is dated Oct. 25, 1995, and refers to a <u>1994</u> loss carryover. There is some question in the Court's mind as to whether 1994 is the year that was intended by the court, because the <u>1993</u> return had not been filed as of the date of the court's order. The 1993 return included a net operating loss carryover worksheet that reflected a net operating loss carryover of $121,470 that would have carried over to the year 1994. Therefore, the income tax return for 1994 presumably would have included as a deduction the $121,470 as reflected on the net
(continued...)

Thereafter, in the same decree, petitioner was awarded "one-half of the net operating tax loss carry forward balance for use on unfiled and future returns."

The 1992 Federal income tax return by petitioner and Mr. Gurr was filed on January 21, 1994, as a joint return. Petitioner and Mr. Gurr were separated at that time. The return was prepared at the direction of Mr. Gurr by his return preparer, a certified public accountant. Petitioner did not sign that return and never authorized anyone to sign the return for her. She did not know a return had been filed for 1992. Nevertheless, petitioner at trial stipulated that she intended to file a joint return for 1992 and did not challenge any of the income or expenses reported on the return.

The 1993 Federal income tax return was also filed as a joint return on May 9, 1996, after the divorce with Mr. Gurr. Petitioner signed that return at the offices of her divorce attorney.

At the time petitioner signed the 1993 return, she was accompanied to her attorney's office by her daughter. Petitioner was not comfortable with the net operating loss deduction of $158,841 claimed on page one of the return (which she referred to

[6](...continued)
operating loss carryover worksheet that was included with the 1993 return.

at trial as a "credit"). She did not want to sign the return and only signed because her attorney recommended that she do so. The lawyer's recommendation was based solely on his belief that, if petitioner signed the return, because of the "credits", she would "never have to pay any income tax for the rest of her life". Not satisfied with that recommendation and requesting a more specific explanation, the attorney's reply was "What difference does it make? You've got credits, and just sign it." Petitioner signed the return and admitted at trial that she was not comfortable with the explanation and recommendation of her attorney with regard to the claimed "credits" on the returns. Petitioner also acknowledged knowing that her attorney was not knowledgeable in tax law; however, she made no attempt to ascertain from other sources the merits of the claimed net operating loss carryover.

Petitioner's daughter cast further light on the circumstances surrounding her mother's signing of the 1993 return. Following is a portion of her testimony on direct examination:

> Q      So, Darla, just moving back to just the signing of this '93 tax return, when you went into the office with your mother, did she ask the attorney about anything on that tax return --
>
> A      Honestly, --
>
> Q      -- before she signed it?

A     -- at first she was going to sign it.  And I says, "What are you doin'?  Why are you just signing that?  Hasn't that gotten you into trouble in the past?"  And so then she started to question it.  And then he -- Billjanic stated to her, "What do you care what is in the return?  It's going to make you not have to pay taxes for the rest of your life.  There's a big credit.  Half of it's going to be declared to you in the divorce decree, so just sign it."  I says, "What are the credits from?  At least you could tell us what the credits are from," and he would not tell us.  He says -- he says, "I really don't know.  They're here.  Sign it.  It benefits your mother.  That's all there is to it."

On cross-examination, petitioner's daughter further testified:

Q     You mentioned that you told your mom, when she was going to sign the return -- * * * "Now, Mom, what are you doing?"  You know, "Hasn't this gotten you in enough trouble in the past?"

A     Right.

Q     What were you talking about?

A     Well, just from how badly that he treated her and that he just expected her to do things.  She never knew what was going on.  I felt that she succumbed to my father and let him rule her and that she should be trying to investigate, to read the documents, and to know what's going on.  I felt that she needed to understand what was going on because much of her life she had been beaten down to the point of where she didn't care what was going on and she needed to learn this.  She needed to be independent and read the documents and understand them before she signed them.

As a general rule, spouses filing a joint return are each jointly and severally liable for the full tax liability for the taxable year of the return under section 6013(d)(3).  Section 6015, however, provides several avenues for relief from the imposition of joint and several liability on a spouse.  Section

6015(b) provides complete or proportionate relief from liability for an innocent spouse, similar to former section 6013(e). Section 6015(c) permits a taxpayer who is divorced or separated to elect to have his or her tax liability calculated as if separate returns had been filed, and, finally, section 6015(f) provides an opportunity to obtain equitable relief if relief is not otherwise available to a spouse.

The Court first addresses petitioner's claim for relief under section 6015(b). To qualify for relief under this provision, a taxpayer must establish that:

(1) A joint return was made under section 6013. Sec. 6015(b)(1)(A).

(2) There was an understatement of tax attributable to erroneous items of one spouse. Sec. 6015(b)(1)(B).

(3) At the time of signing the return, the spouse seeking relief did not know and had no reason to know of such understatement. Sec. 6015(b)(1)(C).

(4) Taking into account all the facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency in tax attributable to the understatement. Sec. 6015(b)(1)(D).

(5) The spouse requesting relief has elected the benefits of subsection (b) within a certain prescribed time period. Sec. 6015(b)(1)(E).

Because these requisites are stated in the conjunctive, it is necessary that the taxpayer claiming relief establish that all requisites of section 6015(b)(1)(A) through (E) have been met. Mitchell v. Commissioner, T.C. Memo. 2000-332; Kalinowski v. Commissioner, T.C. Memo. 2001-21.

Respondent agrees that petitioner satisfies the requirements of section 6015(b)(1)(A), (B), and (E) for both years at issue. Respondent further agrees that, for 1992, petitioner satisfies the requirements of section 6015(b)(1)(C) because petitioner did not know and had no reason to know of the understatement, since petitioner did not sign the 1992 return and did not know the contents of that return.

For 1993, respondent contends that petitioner knew or had reason to know of the understatement of tax and, therefore, fails to satisfy section 6015(b)(1)(C).  Respondent also contends that, as to both 1992 and 1993, taking into account all the facts and circumstances, it would not be inequitable to hold petitioner liable for the understatement under section 6015(b)(1)(D).

With respect to the 1993 return, the Court is satisfied from the record that petitioner had reason to know of the understatement.  Both petitioner and her daughter were more than just skeptical about the substantial carryover loss.  They questioned the past credibility of Mr. Gurr, and, moreover, neither petitioner nor her daughter was satisfied with the

answers to the questions they posed to petitioner's divorce attorney regarding the net operating loss carryover claimed on the return. Yet, in spite of these doubts, neither petitioner nor her daughter looked beyond the inquiries they made with the divorce lawyer. The Court disagrees with petitioner's argument that she is entitled to relief under the standard set forth in Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), revg. an Oral Opinion of this Court, that a spouse has "reason to know" of an understatement if a reasonably prudent taxpayer in his or her position at the time of signing the return could be expected to know that the return contained the understatement. Although this Court is not bound by Price v. Commissioner, supra, under Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), since this case would not be appealable to the Court of Appeals for the Ninth Circuit, the facts here satisfy the Court that petitioner did not meet the standard set forth in Price. Petitioner and her daughter both knew that petitioner's divorce attorney was not knowledgeable about tax law, and the explanations the attorney provided convinced them that such explanations were not satisfactory. Yet, petitioner made no further efforts to go beyond the recommendations of her divorce lawyer. Petitioner was under a duty to inquire further. For 1993, therefore, the Court holds that petitioner possessed constructive knowledge of the

understatement.  <u>Kalinowski v. Commissioner</u>, <u>supra</u>.  Therefore, petitioner has not satisfied the requirement of section 6015(b)(1)(C) with respect to the year 1993.

Under section 6015(b)(1)(D), a spouse seeking relief from joint liability must establish that it is inequitable to hold him or her liable for the deficiency attributable to the understatement based upon due consideration of all the facts and circumstances.

One of the factors to be considered is whether the taxpayer seeking relief has significantly benefited from the understatement on the return.  Sec. 1.6013-5(b), Income Tax Regs.  Transfers of property to the spouse seeking relief are relevant in determining the existence of a significant benefit, and such transfers are not limited to the tax years in which the understatement relates.  <u>Kalinowski v. Commissioner</u>, <u>supra</u>.  In spite of the abusive nature of the marriage over the years, petitioner acquired numerous tracts of land in her name individually and in co-ownership with her spouse, Mr. Gurr.  She was awarded those properties in the property settlement with Mr. Gurr after the two were divorced.

The Court notes that the understatements at issue are based upon adjustments by respondent to Schedules D of the tax returns for 1992 and 1993.  All these adjustments are related to and arose out of the real estate activity reported on Schedules C of

the returns.  No adjustments were made by respondent to Schedules C of the returns for 1992 and 1993.  For both years, net losses were claimed on the Schedules C, which respondent allowed.  Thus, petitioner received a tax benefit from these losses.  On this premise, it appears to the Court that there is a basic inconsistency in petitioner's claim for relief.  On the one hand, petitioner claims she should be relieved of joint liability on the Schedule D adjustments because she was not a participant and not involved in the real estate activity; yet, petitioner does not disavow or disclaim the tax benefits she realized from the Schedule C losses claimed and allowed on the 1992 and 1993 returns, all in connection with the same real estate activity. The case for inequity has not been established.  Petitioner has not satisfied the requisites of section 6015(b)(1)(D) and, accordingly, is not entitled to relief from joint liability under section 6015(b) for both years at issue.

The Court next addresses petitioner's claim for relief under section 6015(c).  As noted earlier, respondent conceded petitioner's entitlement to relief under section 6015(c) to the extent of 50 percent of the understatements relating to most of the adjustments for the 2 years in question, all of which are related to the real estate activity.  Petitioner claims relief for that portion of the understatements not conceded by respondent.

Section 6015(c) provides relief from joint liability for spouses either no longer married, legally separated, or living separate and apart.  Generally, this avenue of relief allows a spouse to elect to be treated as if a separate return had been filed.  Rowe v. Commissioner, T.C. Memo. 2001-325.  Section 6015(c)(2) places the burden of proof with respect to establishing the portion of the deficiency allocable to the electing spouse upon such spouse.

With respect to erroneous deduction items, section 1.6015-3(d)(2)(iv), Proposed Income Tax Regs., 66 Fed. Reg. 3898 (Jan. 17, 2001), entitled Erroneous Deduction Items, provides generally that erroneous deduction items related to a business or investment are allocated to the spouse who owned the business or investment, and, if both spouses owned an interest in such activity, an erroneous deduction item is generally allocated between the spouses in proportion to each spouse's ownership interest unless there is clear and convincing evidence supporting a different allocation.  Erroneous items of income are allocated similarly to the spouse who was the source of the income.  Sec. 1.6015-3(d)(2)(iii), Proposed Income Tax Regs., 66 Fed. Reg. 3898 (Jan. 17, 2001).  Section 6015(c)(2) provides that each individual who elects application of section 6015(c) "shall have the burden of proof with respect to establishing the portion of any deficiency allocable to such individual".

The question here is whether petitioner established by clear and convincing evidence that she did not own any part of the real estate activity giving rise to the disallowed deductions and adjustments relating to Schedules D of petitioner's joint returns for the 2 years at issue.

The record does not support petitioner's contentions. As noted earlier, regardless of Mr. Gurr's threats to her, over the years, petitioner acquired real estate individually and in co-ownership with Mr. Gurr and participated in various legal matters pertaining to the real estate activity, including assisting Mr. Gurr in his personal bankruptcy in accepting title to certain of his real estate to escape the reach of his creditors. The divorce court essentially awarded one-half of the real estate to each and specifically provided that the net operating loss carryover at issue in this case constituted an "asset" of Mr. and Mrs. Gurr, to be divided equally for Federal income tax purposes. Moreover, the Schedule C for the real estate activity for each year at issue reported net losses which were not disallowed by respondent. By filing joint income tax returns for these years, petitioner realized a 50-percent tax benefit from these losses. She is not entitled to relief for the 50-percent portion of the tax understatements from the Schedule D adjustments not conceded by respondent. On this record, petitioner has not established that she is entitled to relief under section 6015(c) for any

amount greater than that conceded by respondent.

Petitioner's final claim for relief is under section 6015(f).  That provision allows the Secretary to relieve a spouse of liability if, taking into account all the facts and circumstances, it is inequitable to hold the spouse liable for any unpaid tax or deficiency and relief is otherwise not available under section 6015(b) or (c).  <u>Cheshire v. Commissioner</u>, 115 T.C. 183, 198 (2000).  This Court's review under section 6015(f) is limited to whether there was an abuse of discretion by the Secretary in denying relief.  <u>Cheshire v. Commissioner</u>, <u>supra</u> at 198; <u>Butler v. Commissioner</u>, 114 T.C. 276, 292 (2000).  On the basis of all the facts and circumstances discussed earlier, petitioner has not established that there was an abuse of discretion by respondent in denying her claim for relief under section 6015(f).

Reviewed and adopted as the report of the Small Tax Division.

<u>Decision will be entered</u>

<u>under Rule 155.</u>[7]

---

[7]    For the year 1993, respondent determined that, because of the income and expense adjustments, $3,936 of Social Security benefits received by petitioner and Mr. Gurr is includable in their gross income.  It appears to the Court that both Mr. Gurr and petitioner received Social Security benefits during 1993;
(continued...)

_____

[7](...continued)
however, the record does not reflect the total amount of the benefits received and the portions thereof received by each spouse. Respondent, on brief, takes the position that, since petitioner did not establish the amount received by Mr. Gurr, the entire amount of taxable Social Security income should be attributed to petitioner. Although respondent is technically correct, the Court is of the view that, if the Social Security amounts received by petitioner and Mr. Gurr that year can be ascertained, and there is no dispute as to these amounts, the amounts received by Mr. Gurr should not be attributed to petitioner. If, however, there is any legal or factual dispute as to this item, then respondent's position is sustained, and the entire amount of the income should be attributed to petitioner.